**MEDICAL SPECIALISTS, INC.,**
**Appellant (Defendant/Counter–**
**Plaintiff Below),**

v.

**Thomas SLEWEON, Appellee**
**(Plaintiff/Counter–Defendant**
**Below),**

**The Methodist Hospitals, Inc., Non-**
**party to Appeal (Third–Party**
**Defendant Below).**

**No. 45A04–9412–CV–489.**

Court of Appeals of Indiana.

June 13, 1995.

Transfer Denied Sept. 28, 1995.

Daniel A. Medrea, Robert F. Peters, Karen L. Hughes, Lucas, Holcomb & Medrea, Merrillville, for appellant.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Medical Specialists, Inc. (Specialists) appeals from the trial court's order declaring the covenant not to compete between Specialists and Dr. Thomas Sleweon (Dr. Sleweon) to be unenforceable, and denying Specialists' request to enjoin Dr. Sleweon from competing with Specialists.

We reverse and remand.

### ISSUE

Whether the trial court erred in declaring the covenant not to compete to be unenforceable and in denying Specialists' request for a permanent injunction.

### FACTS

For the most part, the facts are uncontroverted. Dr. Alexander Stemer, Specialists' president, is an internal medicine doctor with sub-specialty training in infectious diseases. The practice of internal medicine and the practice of infectious disease medicine are not necessarily mutually exclusive in that a particular patient's condition may require resolution of related problems. After completing his medical education, Dr. Stemer located his infectious disease practice in Lake County in 1976. Dr. Jao, who practiced the specialty on a part-time basis, was the only other infectious disease doctor in the area, and he continues to practice infectious disease medicine on a part-time basis.

Essentially, a successful infectious disease practice requires patient referrals from other doctors. For example, if a surgery patient on a respirator develops an infection, the surgeon would contact the infectious disease

doctor for a consultation. Therefore, in an effort to establish links with other doctors, Dr. Stemer obtained privileges at every hospital in the area. He lectured medical students, residents, and doctors on the importance of infectious disease services. He was appointed to many committees at the various hospitals and attended over 200 hours of meetings a year. His typical weekday began at 6:00 a.m. and ended around 9:00 p.m., including hospital rounds and office hours. He made rounds on Saturdays until about 4:30 p.m., and tried to be home by noon on Sundays. Additionally, he was on-call twenty-four hours a day continually for three years.

As his practice grew, Dr. Stemer added new doctors in the areas of infectious disease, pulmonology, and rheumatology, thus creating Medical Specialists. Specialists' office, which essentially provides one-stop shopping for its patients, is located in Munster. Specifically, Specialists' employees help AIDS patients with assistance programs, and furnish access to drugs for indigent patients through pharmaceutical companies' indigent programs. Specialists' office provides laboratory, X-ray, and medication delivery facilities, as well as covered parking to facilitate office access for wheelchair-bound and oxygen-dependent patients. Significantly, Specialists also coordinates Medicaid taxicab services for indigent patients.

Dr. Stemer's hospital involvement led Methodist Hospital to request his services in hospital administration. For a fee, Dr. Stemer agreed to provide epidemiology services to Methodist Hospital–Northlake in Gary and Methodist–Southlake in Merrillville. His main responsibility was to assist the hospitals in the accreditation process.

The epidemiology work demanded a great amount of time, however, making it difficult for Dr. Stemer to care for patients at other hospitals. He therefore hired Dr. Pegwell to perform the epidemiology work as well as to treat patients. She provided coverage at Methodist–Northlake in Gary, Methodist–Southlake in Merrillville, St. Mary Medical Center in Hobart and St. Mary Medical Center in Gary. Methodist–Northlake doctors noted that Specialists' infectious disease service at Methodist–Northlake improved under Dr. Pegwell's tenure.

Five years later, in June of 1993, Dr. Pegwell moved from the area. Before she left, however, Methodist Hospital requested that Dr. Stemer hire a black doctor to replace Dr. Pegwell, and Dr. Stemer agreed. Specialists hired a recruiting firm and spent $26,000.00 in the effort to locate and hire Dr. Sleweon. Dr. Sleweon, who is from New Jersey, had no contact with Indiana prior to being hired by Specialists. To further improve infectious disease services in Gary by cutting down on travel time between hospitals, Dr. Stemer decided to place another doctor at Methodist–Southlake and to assign Dr. Sleweon to Methodist–Northlake, St. Catherine's in East Chicago, and St. Mary's in Hobart.

Usually, the patients' hospital and doctor bills at Methodist–Northlake are paid by Medicare, Medicaid, or an indigent program. Thus, regardless of the number of infectious disease patients Specialists care for, it usually costs more to treat them than Specialists collects. In order to expand the patient base at Methodist–Northlake, to keep Specialists' financial loss to a minimum, and to provide better patient care, Dr. Stemer turned over the patient load to Dr. Sleweon upon his arrival so as to enable Dr. Sleweon to develop good working relationships with referring doctors. Because the infectious disease practice at St. Catherine's and St. Mary's is small, compared to the demand for services at Methodist–Northlake, Dr. Stemer hoped Dr. Sleweon would be able to spend most of his time at Methodist–Northlake taking referrals. By providing a nearly full-time doctor at Methodist–Northlake, Dr. Stemer hoped to appease the Methodist–Northlake administration, who wanted more access to an infectious disease doctor. Finally, Dr. Stemer testified that an additional doctor would improve Specialists' call schedule for vacations, weekends, and holidays.

Dr. Sleweon, who is not yet board certified in infectious disease, signed a one-year contract with Specialists which provided him with a yearly salary of $110,000.00. Additionally, Specialists agreed to provide Dr. Sleweon with malpractice insurance, medical insurance, disability insurance, and life insur-

ance. Specialists also agreed to pay the entire cost of Dr. Sleweon's attendance at one medical conference, as well as for Dr. Sleweon's medical license, hospital staff privileges, and an automobile allowance of $5,000.00. The contract also contained the following covenant not to compete:

> The parties agree that for a period of two (2) years from and after termination of this Agreement, the Doctor covenants and agrees not to own manage, operate, control or be employed by, participate in or render services to or to be connected in any manner with the ownership, management, operation or control of any medical practice, whether said medical practice be maintained as an individual proprietorship, joint venture, partnership, private foundation, corporation or otherwise for a period of two (2) years from the date of termination, and within a radius of ten (10) miles of the hospitals at which Corporation renders patient services.

(R. 738). Specialists provides services to patients at the following ten hospitals in Lake, LaPorte, and Porter Counties: St. Catherine in East Chicago, Community Hospital in Munster, Methodist Hospital–Northlake in Gary, Methodist Hospital–Southlake in Merrillville, St. Margaret Mercy–North in Hammond, St. Margaret Mercy–South in Dyer, St. Anthony Hospital in Crown Point, St. Mary Medical Center in Hobart, Porter Memorial Hospital in Valparaiso, and LaPorte Hospital in LaPorte.

Dr. Sleweon began practicing infectious disease medicine with Specialists on July 1, 1993. The patients Dr. Sleweon treated were either referred to Specialists or to him personally. Many of the these patients had problems which did not exclusively involve infectious disease ailments. Rather, a particular patient's needs often dictated that Dr.

Sleweon employ his knowledge of internal medicine as well.

After several months, Dr. Sleweon became dissatisfied with Specialists' call schedule.[1] On Sundays, one Specialists doctor makes rounds of Specialists' patients at the various hospitals. Thus, every few Sundays, a pulmonologist checks on the infectious disease patients. Dr. Sleweon was not happy with this arrangement, and he was uncomfortable covering pulmonology patients when he was on-call. Finally, although his testimony was not precise, Dr. Sleweon apparently did not feel his patients at Methodist–Northlake were seen frequently enough by the doctors on rounds in his absence.

In September, after having been off-duty on Sunday, Dr. Sleweon learned his patients at Methodist–Northlake had not been seen by the on-call doctor. Upset, Dr. Sleweon reported this to Dr. Stemer on the following Monday. Dr. Stemer assured Dr. Sleweon that something would be done about the problem. To rectify the situation, Dr. Stemer held a meeting with the other Specialists doctors wherein it was concluded that, in the future, the Sunday on-call doctor would visit the Methodist–Northlake patients before visiting patients at other hospitals. Furthermore, Specialists hired Dr. Simon to supplement Dr. Sleweon's practice in Gary on a half-time basis.[2] Thereafter, Dr. Sleweon made no more complaints. In December, Dr. Sleweon submitted his letter of resignation to Dr. Stemer. Dr. Sleweon told Dr. Stemer that he wanted to start his own practice, and expressed concern that he was not on the partnership track. Dr. Stemer assured him that he was, and offered to put that fact in writing. Despite Dr. Stemer's efforts to discover the root of Dr. Sleweon's dissatisfaction, and Dr. Stemer's offer of a substantial raise, Dr. Sleweon was not forthcoming. He merely responded that money

1. Each Specialists doctor makes hospital rounds of his or her patients Monday through Saturday during the approximate hours of 8:00 a.m. and 5:00 p.m. Thereafter, the "on-call" doctor responds to consultation requests. One Specialists doctor is on-call every Sunday. On Saturday, each Specialists doctor is responsible for giving the Sunday call doctor the names of those patients that will need to be seen on Sunday. The Sunday call doctor makes rounds of those patients, and responds to consultation requests.

2. At the time Dr. Stemer hired Dr. Simon, Dr. Simon was chief of infectious disease at Cook County Hospital in Chicago which serves an inner-city patient pool similar to that served by Methodist–Northlake. Dr. Simon signed a three-year contract and began working in July of 1994.

was not the problem. Several days later, Dr. Stemer asked Dr. Sleweon if he would be interested in having an office in Gary. Dr. Stemer even offered to hire Dr. Sleweon's wife to manage the office. Dr. Sleweon declared that the lack of a Gary office was not the problem, and that he planned to begin a practice in Chicago.

Dr. Stemer begged Dr. Sleweon to change his mind and informed him he was free to do so up until the day Specialists hired a replacement doctor. Eventually, Specialists did hire another black infectious disease doctor, Dr. Andoh, to replace Dr. Sleweon as of July 1994. Dr. Andoh signed a two year contract. Sometime thereafter, Dr. Sleweon announced his decision to remain in the northwest Indiana area, and that he would not be moving his practice to Chicago.

Dr. Sleweon's one-year contract with Specialists terminated on June 30, 1994. Dr. Sleweon was well-liked by referring doctors at Methodist–Northlake, and had developed a following during the year he worked there. Methodist–Northlake's administration, having noted that Dr. Pegwell's arrival improved Specialists' coverage of infectious disease patients, observed that coverage further improved under Dr. Sleweon. The administration also reported receiving pressure from individual black doctors who urged Methodist to support Dr. Sleweon.

Therefore, on or about July 2, 1994, Methodist Hospital employed Dr. Sleweon, at a salary of $120,000.00 per year, to provide infectious disease services to Methodist–Northlake in Gary and Methodist–Southlake in Merrillville. Methodist also provided Dr. Sleweon with an office in Gary. While Dr. Sleweon primarily treats patients at Methodist–Northlake, his employment arrangement allows him to treat patients at other hospitals as well. To that end, since leaving Specialists, Dr. Sleweon has actively solicited referring doctors at St. Catherine's in East Chicago and St. Mary's in Hobart for patients, and is on staff at Northwest Family Hospital in Gary. Additionally, since leaving Specialists, Dr. Sleweon has attempted to obtain a partner.

Northwest Family Hospital, which is located a few blocks away from Methodist–North-lake, was previously known as St. Mary's Hospital and was affiliated with St. Mary's in Hobart. St. Mary's in Gary was later purchased by a for-profit company and re-named Northwest Family. Specialists maintained staff privileges at the hospital when it was St. Mary's. However, Specialists dropped its privileges after the buy-out because the hospital operated only 115 to 120 beds and did not provide services which generate infectious disease consultations, such as obstetrics, open-heart, neurosurgery, and neo-natal intensive care. Dr. Jao, for whom Specialists occasionally provides back-up coverage, provides infectious disease coverage for Northwest Family, and, therefore, Specialists found no need at Northwest for its services. However, prior to Dr. Sleweon's departure from Specialists, Dr. Stemer began continuing discussions with Northwest Family concerning the institution of a respiratory clinic and a foot/wound clinic, as well as the take-over of Northwest Family's infection control program and its antibiotic utilization program.

On June 30, 1994, the day his contract with Specialists expired, Dr. Sleweon filed a complaint for declaratory judgment requesting the trial court to declare the covenant not to compete found in Dr. Sleweon's contract with Specialists to be unenforceable. On July 14, 1994, Specialists responded with a request for a preliminary injunction against Dr. Sleweon. In the meantime, despite the fact Drs. Simon and Andoh were available for referrals from Methodist–Northlake doctors beginning the first of July, no consultations had been requested of either doctor as of the time of trial. Dr. Sleweon received every referral. Because of time constraints, the trial court did not hold a hearing on Specialists' request for a preliminary injunction. Rather, a trial on the merits was held on Dr. Sleweon's complaint for declaratory judgment and Specialists' request for a permanent injunction on August 18, 1994.

Trial exhibits revealed that Specialists serves patients from all over the northwestern portion of Indiana, in addition to serving some patients who travel from Illinois. Lake

County has a population of 475,594.[3] The following list indicates the number of patient visits made by Specialists to the Lake County hospitals it serves during the time period beginning July 1, 1993 and ending June 24, 1994:

| | |
|---|---|
| Community Hospital/Munster | 6,375 |
| St. Margaret Mercy–South/Dyer | 2,424 |
| St. Anthony/Crown Point | 1,413 |
| St. Margaret Mercy–North/Hammond | 3,358 |
| St. Catherine/East Chicago | 4,353 |
| Methodist–Southlake/Merrillville | 459 |
| St. Mary Medical Center/Hobart | 182 |
| Methodist–Northlake/Gary | 4,179 |

(R. 861). Porter County has a population of 128,932. During the time-period noted above, Specialists served 127 patients at Porter Memorial Hospital in Valparaiso. Although Dr. Stemer has had emergency privileges at Porter Memorial since 1979, and has in the past had a Specialists doctor assigned to the hospital, during the mid–1980's demand for Specialists services greatly increased in Lake County. Therefore, in order to spend more time in Lake County, Specialists did not renew its privileges at Porter Memorial, and Porter County doctors sent their patients to Lake County for Specialists service. In 1992, when it began receiving more requests for services, Specialists renewed its privileges at Porter Memorial. No other infectious disease doctors serve Porter County. Finally, LaPorte County has a population of 107,066 and Specialists served 671 patients during the same time period at LaPorte Hospital in LaPorte. LaPorte County has an infectious disease group, other than Specialists, which serves the Michigan City area. The above-mentioned figures do not include office visits.

The trial court found the terms of Dr. Sleweon's covenant not to compete with Specialists to be unreasonable and, therefore, unenforceable. Accordingly, the trial court denied Specialists' motion for an injunction. Additional facts will be presented in our discussion of the issues.

## DECISION

Essentially, Specialists argues that the trial court erred in determining Dr. Sleweon's covenant not to compete with Specialists to be unenforceable. Therefore, Specialists contends, the trial court erred in denying its request for an injunction against Dr. Sleweon.[4] We agree.

The ultimate determination of whether a noncompetition covenant is reasonable is a question of law. *Raymundo v. Hammond Clinic Ass'n* (1983), Ind., 449 N.E.2d 276, 280. In order to be valid, a promise imposing a restraint on trade or occupation must be reasonable. The question of reasonableness is for the court and it is to be determined by looking at all the facts and circumstances surrounding each case. *Frederick v. Professional Bldg. Main. Indus. Inc.* (1976), 168 Ind.App. 647, 344 N.E.2d 299, 301. In considering what is reasonable, regard must be paid to: (a) the question whether the promise is wider than is necessary for the protection of the covenantee in some legitimate interest; (b) the effect of the promise upon the covenantor; and (c) the effect upon the public. *Donahue v. Permacel Tape Corp.* (1955), 234 Ind. 398, 408, 127 N.E.2d 235, 239.[5]

### A.

### SPECIALISTS' PROTECTABLE INTEREST

Our review of the facts and the covenant not to compete indicates the covenant

---

**3.** This figure and those population figures which follow are taken from the report of the 1990 Census admitted at trial.

**4.** We note that Dr. Sleweon failed to timely file an appellee's brief. Thus, where no answer brief is filed, the judgment may be reversed if the appellant's brief presents a prima facie case of error. *Farm Credit Services v. Estate of Decker* (1993), Ind.App., 624 N.E.2d 491, 493. The prima facie error rule protects this court and relieves it from the burden of controverting arguments advanced for reversal, a duty which properly remains with counsel for the appellee. *Id.* This court is not bound by this rule, however and in the exercise of our discretion we may consider the questions properly presented and decide the case on its merits. *Id.* We exercise that discretion here.

**5.** *In Unishops, Inc. v. May's Family Centers, Inc.* (1980), Ind.App., 399 N.E.2d 760, 763 n. 1, we stated:

The proper standard of review for injunctive relief which has, as its basis, a breach of a restrictive covenant, is one of "reasonableness." The Court's traditional "sufficiency of the evidence" review is encompassed by this reasonableness standard.

was necessary for Specialists' protection in the pursuit of a legitimate interest. The evidence reveals that since 1976, Dr. Stemer's substantial efforts in building his infectious disease practice resulted in the creation of Medical Specialists, a successful multi-specialty group. Clearly, the continued success of the practice, which is dependent upon patient referrals, is a legitimate interest worthy of protection. The presence of Dr. Sleweon, who had no ties with Indiana until he was recruited by Specialists, in the Gary area is a direct result of Specialists' efforts to ensure a successful practice in Gary. Further, Dr. Sleweon's ability to spend more time with Methodist–Northlake patients than was possible for Dr. Stemer was a direct result of Specialists having geographically tailored Dr. Sleweon's responsibilities. Thus, had it not been for Specialists' efforts in recruiting, hiring, and placing Dr. Sleweon primarily in Gary, Methodist–Northlake patients would not have benefited from his services.

Moreover, Specialists presented evidence that its practice has been damaged in the short time Dr. Sleweon has been competing. Dr. Stemer testified that the split has strained Specialists' relationships with referring doctors, causing Specialists to lose patients, and therefore revenue, because no referrals have been made to either Dr. Simon or Dr. Andoh. Thus, these doctors are unable to establish themselves in the Gary area. Nevertheless, Specialists is still obligated to pay Dr. Simon a salary for three years, and Dr. Andoh a salary for two years.

Dr. Stemer also testified that without the covenant not to compete, which all Specialists doctors have signed, he has no protection against other Specialists doctors leaving, competing in cities other than Gary, and bankrupting his practice.

Thus, Specialists has demonstrated that it has a legitimate interest worthy of protection by the covenant not to compete. *See Harris v. Primus* (1983), Ind.App., 450 N.E.2d 80, 85

("members of the Clinic who spent years and money developing the Clinic had a legitimate and realistic desire to protect not only their investment in Dr. Primus but also to restrict her competition with them once she left the Clinic. They have a protectable interest in enforcing the covenant against Dr. Primus ....").[6]

### B.

### EFFECT ON DR. SLEWEON

The reasonableness of the effect of the covenant upon Dr. Sleweon depends upon a consideration of the protection granted by the covenant in terms of time, space, and the types of activity or conduct prohibited. *Harris, supra* at 84.

Again, the covenant not to compete provides:

> The parties agree that for a period of two (2) years for and after termination of this Agreement, the Doctor covenants and agrees not to own manage, operate, control or be employed by, participate in or render services to or to be connected in any manner with the ownership, management, operation or control of any medical practice, whether said medical practice be maintained as an individual proprietorship, joint venture, partnership, private foundation, corporation or otherwise for a period of two (2) years from the date of termination, and within a radius of ten (10) miles of the hospitals at which Corporation renders services.

(R. 738).

Covenants not to compete containing two-year restrictions on medical competition were upheld in *Raymundo v. Hammond Clinic Ass'n* (1983), Ind., 449 N.E.2d 276 and *Gomez v. Chua Medical Corp.* (1987), Ind.App., 510 N.E.2d 191, 196, *reh'g denied, trans. denied.* Dr. Sleweon did not challenge the two-year restriction at trial, and because the record fails to reveal any evidence as to why

---

6. At trial, a great deal of emphasis was placed upon the fact that Specialists' practice at Methodist–Northlake has not historically been profitable. However, we know of no authority which dictates a professional practice must be profitable to warrant protection. Furthermore, this fact is immaterial to the determination that Specialists has a legitimate interest to protect because Methodist–Northlake is only one of the ten hospitals that comprise Specialists' practice—all of which are covered by the covenant not to compete.

the particular circumstances of this case render the two-year competition restriction unreasonable as to Dr. Sleweon, we find it to be reasonable.

Next, we must determine whether the prohibition against Dr. Sleweon practicing within a ten-mile radius of each hospital Specialists serves is reasonable. We first note that the geographical restriction extends into parts of Illinois whose hospitals are not served by Specialists. Our supreme court upheld a medical covenant not to compete which included a geographical restriction extending into Illinois in *Raymundo, supra.* Further, in *Fumo v. Medical Group of Michigan City* (1992), Ind.App., 590 N.E.2d 1103, 1109, *reh'g denied, trans. denied,* we found as a matter of law that a covenant was not overbroad merely because it encompassed hospitals other than those serviced by the employer.

Thus, we cannot say the geographical restriction is unreasonable because it extends into Illinois and covers hospitals not served by Specialists. Similarly, the fact that Specialists does not currently serve Northwest Family in Gary, which is located a few blocks from Methodist–Northlake, does not render the geographic restriction unreasonable either. As our supreme court noted in *Raymundo, supra:*

> [W]e are aware of no authority indicating that in order for a covenant to be reasonable, the covenantee must show that it had rendered its service or sold its product in every nook and cranny of the protected area. Were it otherwise, no such covenant could ever stand.

*Id.* at 282.

In determining the reasonableness of the geographic restriction in *Gomez, supra,* we considered whether a substantial patient base existed within the proscribed area. *Id.* at 193. Here the evidence reveals that patients travel from Illinois as well as Lake, Porter, LaPorte, Starke, St. Joseph, and Jasper Counties in Indiana to be treated at the hospitals Specialists serves in Lake, Porter, and LaPorte Counties. While it is clear from the evidence presented in FACTS that Specialists treats thousands of patients in Lake County Hospitals, it is impossible to determine the percentage of those patients who live within a ten-mile radius of each hospital from the evidence presented at trial. The same is true for the more sparsely populated counties of Porter and LaPorte where Specialists treat far fewer patients than are treated in Lake County.

However, a successful infectious disease practice is largely dependent upon patient referrals from other doctors, as opposed to patient preference and selection. Thus, for Specialists, it is important to protect its established source of referrals—the hospitals—from Dr. Sleweon's competition. Under these circumstances, we conclude that the issue of whether Specialists enjoyed a substantial patient base within the proscribed area is not an important consideration in determining the reasonableness of the geographic restriction.

Until Dr. Sleweon began competing, Specialists received referrals from doctors at each of the hospitals mentioned in FACTS; and, in Section A, we concluded that the continued success of Specialists' practice, which is dependent upon patient referrals, is a legitimate interest worthy of protection. Thus, we find the covenant's prohibition against Dr. Sleweon practicing within a ten-mile radius of each hospital served by Specialists to be a reasonable effort to protect that interest.

Finally, we must determine whether the type of activity proscribed is reasonable. The covenant not to compete essentially prohibits Dr. Sleweon from being involved in any medical practice. At trial, Dr. Sleweon admitted that many of the illnesses he treats require not only that he utilize his specialized infectious disease knowledge, but that he also must employ his basic internal medicine skills. When asked why the covenant prohibited Dr. Sleweon from becoming involved in an internal medicine practice, Dr. Stemer explained that because of the nature of the practice of infectious disease medicine, it would be impossible to know whether Dr. Sleweon was, in fact, limiting himself to the practice of internal medicine. The evidence indicates the activity proscribed is reasonable.

After having considered the covenant in terms of time, space, and the activity proscribed, we find the effect of the covenant upon Dr. Sleweon to be reasonable.

## C.

### PUBLIC POLICY

The most hotly contested issue at trial was whether the covenant not to compete violates public policy. The entire thrust of Dr. Sleweon's case centered on the City of Gary's alleged need for his services. The implication of the testimony of the witnesses testifying on Dr. Sleweon's behalf was that the enforcement of the covenant would be injurious to Gary patients who require infectious disease services, thus rendering the covenant void as against public policy.

On the other hand, Specialists argues the evidence fails to indicate that Gary citizens would be harmed by the enforcement of the covenant. We agree.

In the absence of a showing that any particular contract brought before the court is contrary to what the constitution, the legislature or the judiciary have declared to be the public policy, it is necessary in order to have the court hold it void on the ground of public policy, to show clearly that such contract has a tendency to injure the public, or is against the public good or is inconsistent with sound policy and good morals as to the consideration or as to the thing to be done or not to be done. Whether or not a contract is against public policy is a question of law for the court to determine from all of the circumstances in a particular case. The courts will keep in mind the principle that it is to the best interest of the public that persons should not be unnecessarily restricted in their freedom of contract and that their agreements are not to be held void as against public policy, unless they are clearly contrary to what the constitution, the legislature, or the judiciary have declared to be the public policy or unless they clearly tend to the injury of the public in some way.

*Raymundo, supra* at 279 (quoting *Hodnick v. Fidelity Trust Co.* (1932), 96 Ind.App. 342, 350, 183 N.E. 488, 491).

At trial, Dr. Ricardo Hood, health commissioner for the City of Gary, testified that Gary had been designated by the Department of Health and Human Services as a medically underserved area, which indicates a shortage of doctors. Dr. Hood explained that, in determining Gary's status, the government applied numerical standards to the various medical specialties; he conceded that he did not know if Gary had been determined to be underserved in the area of infectious disease.

Personally, Dr. Hood was concerned that Gary would be underserved if Dr. Sleweon were prohibited from practicing in the area. George Bourrell, the executive vice-president and chief operating officer of Northwest Family, echoed this concern. Bourrell based his opinion on the fact that Gary hospitals provide medical service to large numbers of Medicaid, Medicare and indigent care recipients who need more infectious disease services than would an average community because of these patients' lack of preventive care. Thus, both men inferred that Dr. Jao, who maintains a Gary office, would be incapable of handling Gary's infectious disease requirements on his own. In formulating their opinions, however, neither man considered the infectious disease services which are available from Drs. Simon and Andoh.

In contrast, Dr. Theodore Eickhoff, an infectious disease doctor and professor of medicine at the University of Colorado School of Medicine, testified that, on average, there are only .75 to .80 full-time equivalent infectious disease doctors per 100,000 citizens in the United States. Dr. Eickhoff, who is also chairman of the manpower and training committee of the Infectious Disease Society of America, based his data upon a study done by that committee in March and April of 1994. In his opinion, a population base consisting of a higher than average percentage of Medicaid and Medicare patients, such as Gary, would need approximately .8 or .9 infectious disease doctors per 100,000 people.

Thus, Dr. Eickhoff opined, the infectious disease services offered to the approximately

116,000 people of Gary by Drs. Jao, Simon and Andoh substantially exceed the national average, and that those services are more than adequate to meet the special needs of Gary citizens. For example, neither Dr. Jao, who practices infectious disease medicine approximately half-time, nor Dr. Sleweon, who practices full-time, has had to refuse a patient referral. Moreover, basing his opinion on the population of Lake, Porter, and LaPorte Counties, Dr. Eickhoff believed the services of Specialists' five infectious disease doctors, as well as those of Dr. Jao, are more than adequate to serve the infectious disease needs of those counties. Dr. Eickhoff's opinions included consideration of the number of HIV/AIDS patients in the area, but did not take into account the infectious disease services offered by Dr. Sleweon.

Thus, the evidence fails to reveal a shortage of infectious disease doctors in Gary which would justify the need for Dr. Sleweon's services. Rather, the undisputed evidence indicates the services of Drs. Jao, Simon, and Andoh are more than adequate to meet Gary's infectious disease service needs.

At trial, two doctors and the vice-president of community health services at Methodist–Northlake alleged that, essentially, the infectious disease patients in Gary have not been well-served by Specialists. The witnesses elaborated upon three "public policy" complaints, the first of which centers around Specialists' call schedule. Dr. Stemer explained that doctors comprising Specialists alternate call. Apparently, Gary doctors object to this practice because those who want an infectious disease consultation after normal working hours are not always able to consult an infectious disease doctor if a pulmonologist is on-call. However, like infectious disease doctors, pulmonologists are first trained in internal medicine and are, therefore, qualified to handle routine problems. For serious problems or at a doctor's request, a Specialists' infectious disease doctor is always on back-up call. Dr. Stemer compared Specialists' schedule to the call schedule in an academic setting where medical students, interns, and residents, who are not board-certified in anything, handle routine problems and call their attending doctors for serious situations.

In an attempt to illustrate the concern, a doctor testifying on behalf of Dr. Sleweon recalled that on a Sunday several weeks before trial, a Specialists' pulmonologist, rather than an infectious disease doctor, responded to his request for a patient consultation. Apparently, this witness was displeased because a pulmonologist was already on the case. However, Dr. Stemer testified that as the back-up infectious disease doctor that particular Sunday, he gave the Specialists' pulmonologist antibiotic instructions and offered to visit the patient. Dr. Stemer was told a visit was unnecessary.

While Specialists' call schedule may have annoyed the testifying witness, there is no evidence that Specialists' treatment was substandard. Nor is there evidence that the health of this patient was in any way compromised by Specialists' call schedule.

Dr. Eickhoff testified that Specialists' call schedule is reasonable and is often employed by infectious disease doctors. For example, Dr. Jao testified he sometimes uses surgeons and internists to cover his patients when he is unavailable. Furthermore, Dr. Stemer testified that with the addition of Dr. Simon, Specialists now has enough infectious disease doctors to cover each other.

Thus, there is no evidence that Specialists' call schedule has injured, or will be injurious to, Gary patients who are in need of infectious disease services.

The second complaint leveled by these witnesses was that Specialists' response time to requests for consultations is poor. Dr. Stemer agreed and explained that the reason for this problem is that the hospital system in Lake County is comprised of numerous small hospitals, as opposed to one large medical center. These small hospitals do not generate a patient base large enough to support an infectious disease doctor's practice. As a result, Dr. Stemer and other Specialists doctors spent a great deal of time traveling from one hospital to another.

However, the witnesses agree that first under Dr. Pegwell and later under Dr. Sleweon, whose practices were geographically

limited, Specialists' response time at Methodist–Northlake greatly improved; and we note that with the presence of both Dr. Andoh and Dr. Simon at Methodist–Northlake, Specialists' response time will, no doubt, improve once again.

Our review of the record indicates that Dr. Sleweon failed to present any evidence that Specialists' historically slow response time is a current problem. Rather, the evidence unequivocally reveals that Specialists' response time has greatly improved over the last five years, which is a direct result of plans implemented by Dr. Stemer. Most importantly, however, Dr. Sleweon failed to present any evidence that Specialists' slow response time has ever caused a patient any harm.

Finally, several witnesses indicated the fact that Specialists does not maintain an office in Gary creates a transportation problem for many of Gary's poor patients. Specifically, witnesses alleged that Gary patients have complained that they are unable to travel to Specialists' office in Munster because of a lack of public transportation.

However, Dr. Sleweon presented no evidence that, in fact, no public transportation exists between Gary and Munster. Further, there is no evidence indicating any Gary patient needed to travel to Specialists' Munster office for treatment; there is no evidence that any patient needed to travel to the Munster office and was unable to do so; and, finally, there is no evidence that any patient has suffered harm because he or she needed to travel to the Munster office and was unable to do so. Rather, the evidence indicates that no doctor or patient has complained to Dr. Stemer or requested that Specialists open an office in Gary. Moreover, Specialists' Munster office arranges Medicaid taxicab transportation for indigent patients. Thus, there is no evidence that Gary patients have been injured by the fact that Specialists does not maintain a Gary office.

Furthermore, we note that Dr. Sleweon refused Dr. Stemer's offer to open an office in Gary and, therefore, question Dr. Slew-

eon's implied intentions to serve the poor patients in Gary—especially in light of the fact that he also treats patients at Methodist–Southlake in Merrillville and Northwest Family in Gary, and that he has solicited patient referrals at St. Catherine's in East Chicago and St. Mary's in Hobart—both of which are served by Specialists and are covered by the covenant not to compete. Practicing at all five of these hospitals would seem to leave Dr. Sleweon open for the same complaints his witnesses leveled against Specialists at trial.[7] Moreover, there is no evidence that Dr. Sleweon possesses any special infectious disease skills that are not offered by Drs. Andoh and Simon. *See Fumo, supra* at 1109. Thus, we must conclude that the citizens of Gary will not be harmed by the enforcement of the covenant not to compete between Dr. Sleweon and Specialists.

We are also mindful of the fact that the covenant not to compete covers not only Methodist–Northlake in Gary, but also hospitals located in Munster, Dyer, Crown Point, Hammond, East Chicago, Merrillville, Hobart, Valparaiso and LaPorte. Dr. Sleweon wholly failed to present evidence that the covenant is injurious to the populations of these towns and cities. In fact, he failed to present any evidence concerning these towns and cities at all. Thus, Dr. Sleweon has failed to clearly show that the covenant not to compete has a tendency to harm the public.

■ When determining whether or not a contract is against public policy, we must keep in mind that it is to the best interest of the public that persons should not be unnecessarily restricted in their freedom of contract. *Raymundo, supra* at 279. Thus, because covenants not to compete which restrict the provision of medical services in a proscribed area are not *per se* against public policy, *Id.* at 281, we must consider the fact that Dr. Stemer has a right to enter into a contract which reasonably protects Specialists' "goodwill against piracy by a mutinous partner." *Id.* at 279. By the same token,

---

7. For example, is public transportation available for poor patients living in East Chicago to Dr. Sleweon's office in Gary?

Dr. Stemer should be able to rely on the promise made by Dr. Sleweon, a highly educated man who was under no duress when he signed the employment contract with Specialists which contained the covenant not to compete, to abide by the terms of the contract. Furthermore, our supreme court recently reaffirmed the "traditional precaution against the reckless use of public policy as a means for invalidating contracts" in *Straub v. Todd* (1994), Ind., 645 N.E.2d 597, 599 n. 3, *reh'g denied.*

Because Dr. Sleweon has failed to clearly show that the covenant not to compete is injurious to the public, we cannot say the covenant is void as against public policy in light of the importance to the public of Drs. Stemer and Sleweon's freedom to contract.

### CONCLUSION

The covenant not to compete between Dr. Sleweon and Specialists is reasonable. Accordingly, the trial court erred in declaring the covenant to be unenforceable and denying Specialists' request for an injunction. We reverse and remand for further proceedings consistent with this opinion.

Reversed and remanded.

KIRSCH, J., concurs.

CHEZEM, J., concurs in result.