**HARLAN LABORATORIES, INC., Plaintiff,**

v.

**Gerald CAMPBELL and Charles River Laboratories International, Inc., Defendants.**

**Civil Action No. 12–10995–PBS.**

United States District Court, D. Massachusetts.

Oct. 25, 2012.

---

Patrick M. Curran, Jr., Ogletree, Deakins, Nash, Smoak & Stewart, Boston, MA, for Harlan Laboratories, Inc. (Plaintiff).

Amanda M. Kellar, Andrea C. Kramer, Scott A. Roberts, Hirsch, Roberts, Weinstein, LLP, Boston, MA, for Gerald L. Campbell and Charles River Laboratories International, Inc., (Defendants).

Danielle Y. Vanderzanden Ogletree, Deakins, Nash, Smoak & Stewart, P.C., for Gerald L. Campbell (Defendant) and Harlan Laboratories, Inc. (Plaintiff).

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. INTRODUCTION

Plaintiff Harlan Laboratories, Inc. ("Harlan") has moved for a preliminary injunction enforcing the terms of a one-year non-competition agreement with Defendant Gerald Campbell, a former regional sales manager, who is now employed by Defendant Charles River Laboratories International, Inc. ("Charles River"), a competitor, as the Director of Global Marketing. The motion for preliminary injunction also seeks to enjoin Charles River from using or disclosing any of the confidential, proprietary, or trade secret information obtained from Campbell. After hearing, the Court **ALLOWS** Plaintiff's motion for a preliminary injunction to enforce its non-competition agreement.

### II. FACTUAL BACKGROUND

Based on the record, the court finds that the following facts are likely true. Harlan is a company in the business of managing, producing, storing, and supplying various laboratory animals, laboratory animal diets, products related to laboratory animals, and research antibodies to researchers around the world in medical and science industries. Harlan also provides non-clinical and pre-clinical Contract Research Organization ("CRO") services to researchers in those industries. Charles River is engaged in the same industry and is one of Harlan's three main competitors. The market for these products and services is specialized and competitive, such that businesses grow by taking market share from one another.

Campbell was employed as a sales account manager and regional manager with Harlan from November 2007 until May 2012. Before working for Harlan, Campbell had been employed in several jobs in other life sciences industries, including sales of disposable research and clinical products and sales of glassware and plastic laboratory tools. At the start of his employment with Harlan, he executed an employment agreement containing a non-disclosure clause and "Covenants Against Competition" clause. Campbell's contract with Harlan Laboratories provides in relevant part:

> During Employee's employment and for a period of one (1) year after he ceases to be employed by Employer, Employee shall not in the geographical area of the United States be employed by any of the following companies, their subsidiaries, divisions, or affiliates: Charles River Laboratories, Taconic, and the Jackson Laboratory, or be employed by any business which competes directly with Employer in the business of managing, producing, supplying and selling laboratory animals, or providing preclinical CRO services . . .

Campbell's job responsibilities as a regional manager at Harlan included managing sales representatives, establishing sales budgets, tracking sales progress, and managing the Salesforce database that contained all of Harlan's client information. (Campbell Aff. ¶¶ 27–28, 35–37.) Some of these job functions required direct customer contact, as well as overseeing some of Harlan's most strategically important ac-

counts. (Campbell Aff. ¶ 28; Mills Aff. ¶ 7).

Harlan asserts that in this role of regional manager, Campbell had to learn and use Harlan's confidential research model development. (Meyer Aff. ¶ 19.) It also states that Campbell's important accounts included the world's largest CROs. (Mills Aff. ¶ 7). Campbell contests these claims, asserting that he never worked with Harlan's non-clinical or preclinical CROs division, and that all his knowledge of Harlan's research models and processes is public knowledge. (Campbell Aff. ¶¶ 47–52). However, Campbell does not dispute that as sales manager, he had regular access to a wide range of confidential information, customer preferences, inventory reports, pricing customer-specific information, sales opportunities, sales records, sales revenue data and more. (Campbell Aff. ¶¶ 58–65, Meyer Aff. ¶ 22.) Campbell insists, though, that he does not specifically remember this information.

Harlan also asserts that Campbell implemented long and short term marketing plans, and participated in confidential strategy and leadership meetings and marketing conferences, (Mills Aff. ¶ 6; Meyer Aff. ¶ 20.) Again, Campbell disputes that he knows confidential marketing strategies, but concedes he was involved in monthly sales review meetings (Campbell Aff. ¶ 55.)

On April 6, 2012, Campbell accepted an offer to work for Charles River and submitted a letter of resignation with Harlan Laboratories on the same day. On April 12, 2012, Campbell informed Harlan that he would be working for a competitor. Sometime before April 16, 2012, Harlan learned that Campbell had received an offer from Charles River and subsequently sent a letter on April 16 reminding him of the employment contract he had signed. The letter also informed Campbell that the prospect of litigation, should he choose to accept an offer with a competitor, was "very real" and notified him that he should preserve all documents related to Charles River and Harlan. (Aff. Meyer, Ex. 1.)

Campbell's last day of work at Harlan was May 4, 2012. He began work at Charles River on May 7 as the Global Marketing Director for Research Models and Services. Campbell describes his responsibilities in this role as developing marketing plans and advertising campaigns, building collateral and global products catalogs, conducting webinars, launching new products and services, coordinating strategies for trade shows, developing website content, and driving marketing communications. (Campbell Aff. at ¶ 80.) He also claims that he markets products and services that Harlan does not offer in North America, such as research animal diagnostics and genetically engineered models and services. *Id.* at ¶ 81.

On May 29, while working at Charles River, Campbell received an email from a new Charles River colleague, Bruno Privat, requesting help on a market share analysis. That same night, Campbell accessed a flash drive and opened several files containing Harlan's confidential information. The files contained thousands of pages of information, including a discount report, confidential client contact information, and powerpoint presentations for important clients. One document that was accessed by the Defendant (and viewed by the Court) contained the descriptions of thousands of client orders, including the names of the client, the products bought, with pricing and discount information. Campbell saved several of these files to his computer, and subsequently discarded the flashdrive. Campbell asserts that he does not remember reviewing or copying the information, but recalls throwing out a

Harlan-branded flashdrive along with other Harlan paraphernalia. (Campbell 2nd Aff. ¶ 3.) There were other instances where Charles River employees requested information from Campbell regarding Harlan. (Spencer Aff. ¶ 7, Mullane Aff. ¶¶ 4–5, Pritchett–Corning Aff. ¶¶ 4–6.) While it is contested whether Charles River employees were asking for confidential or publicly available information, there is no evidence that Campbell actually accessed or provided Harlan's information in response to these requests.

On June 4, 2012, Harlan filed a complaint in this court against Defendants Campbell and Charles River, alleging, *inter alia,* breach of contract, misappropriation of confidential information, and unfair and deceptive trade practices. A motion for preliminary injunction was filed by plaintiffs on June 12, 2012 against both defendants.

### III. DISCUSSION

### A. Standard of Review

█ It is well-settled that, when considering a motion for a preliminary injunction, a district court must weigh four factors: "(1) the plaintiff's likelihood of success on the merits of its claims; (2) the potential for irreparable harm to the plaintiff in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs (i.e., a balancing of the equities); and (4) the effect, if any, on the public interest." *United States v. Weikert,* 504 F.3d 1, 5 (1st Cir.2007). A preliminary injunction is a "potent weapon." *Charlesbank Equity Fund II v. Blinds To Go, Inc.,* 370 F.3d 151, 163 (1st Cir.2004). Therefore, the party seeking the injunction bears the

burden of demonstrating each factor. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70,* 415 U.S. 423, 441, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974).

### B. Likelihood of Success on the Merits

### 1. Breach of Covenant not to Compete

█ Plaintiff has moved for injunctive relief seeking enforcement of the noncompetition agreement with defendant Campbell. Under Indiana law,[1] noncompetition agreements or covenants not to compete are considered "in restraint of trade and disfavored by law." *Cent. Ind. Podiatry, P.C. v. Krueger,* 882 N.E.2d 723, 728–29 (Ind.2008). Accordingly, they are "strictly [construed] against the employer and are enforced only if reasonable." *Id.* at 729. The question of reasonableness is one for the courts and is to be determined on a case-by-case basis "by looking at all facts and circumstances surrounding the case." *Med. Specialists, Inc. v. Sleweon,* 652 N.E.2d 517, 522 (Ind.Ct.App.1995). *See also Bridgestone/Firestone v. Lockhart,* 5 F.Supp.2d 667, 683 (S.D.Ind.1998) (determinations of reasonableness "must be made on a case-by-case basis . . . ."). The validity of a covenant not to compete ultimately depends not only upon the covenant itself, but also on the entire employment contract and the "situation to which it is related." *Donahue v. Permacel Tape Corp.,* 234 Ind. 398, 127 N.E.2d 235, 237 (1955).

█ In evaluating the reasonableness of a noncompetition covenant, the court must consider 1) the legitimate interests of the employer; 2) the restrictions on the employee; and 3) the public interest. *Titus v. Rheitone, Inc.,* 758 N.E.2d 85, 93

---

1. Indiana law applies in this case because the contract between Harlan and Campbell stipulates that the agreement is to be governed by Indiana law.

(Ind.Ct.App.2001). *See also Krueger,* 882 N.E.2d at 728–29. To demonstrate a legitimate interest, the employer must show "that the former employee has gained a unique competitive advantage or ability to harm the employer...." *MacGill v. Reid,* 850 N.E.2d 926, 929 (Ind.Ct.App.2006), *quoting Pathfinder Communications Corp. v. Macy,* 795 N.E.2d 1103, 1109 (Ind. Ct.App.2003). If the employer has asserted a legitimate protectible interest, the court then determines whether the scope of the agreement is reasonable in terms of time, geography and types of activity prohibited. *Titus,* 758 N.E.2d at 92.

### a. Legitimate Protectible Interest

█ Harlan seeks to protect its proprietary confidential information and business good will through operation of the noncompetition provisions in its employment agreement. Indiana courts have held that employers have a legitimate protectible interest in confidential information and the good will of a business generated through interactions with customers. *McGlothen v. Heritage Envtl. Servs., LLC,* 705 N.E.2d 1069, 1072–73 (Ind.Ct.App.1999). Goodwill includes secret or confidential information such as the names and addresses of customers and the advantage acquired through representative contact. *Unger v. FFW Corp.,* 771 N.E.2d 1240, 1244 (Ind. Ct.App.2002). Campbell makes no argument that the company's confidential information and business good will do not qualify as legitimate protectible interests.

### b. Reasonableness in Scope of Agreement

█ Indiana law requires a showing that the scope of the restrictions in a noncompetition agreement is reasonable. *Pathfinder,* 795 N.E.2d at 1109. Such restrictions "must be sufficiently specific in scope to coincide with only the legitimate interests of the employer and to allow the employee a clear understanding of what conduct is prohibited." *MacGill,* 850 N.E.2d at 930. Campbell does not contest the time or geography restrictions in the noncompetition agreement but argues that the activities restricted by the contract are not sufficiently specific in scope, preventing him from working in job functions to which he had no exposure at Harlan. Prohibiting him from working in *any* capacity for *any* competitor, he contends, is overbroad. Harlan, in contrast, argues that the prohibition on all of Campbell's work activities is narrowly tailored to cover only the small and competitive business field in which Harlan operates and, so, is reasonable in relationship to Harlan's legitimate interests.

Indiana courts have disagreed as to whether a covenant not to compete that prevents a defendant from being employed in any capacity for any business in competition with the former employer is unreasonable and unenforceable. *Compare Unger,* 771 N.E.2d at 1245 (holding that a noncompetition clause, which restricted the employee from "participating in any 'business competitive with the business of [his former employer]'" was reasonably limited in the type of activity it prohibited), *Titus,* 758 N.E.2d at 93–94 (holding the covenant was not wider than necessary to protect [employer's] legitimate interest, even though the "restrictions ma[d]e it difficult for [employee] to remain in prepress field."), *and Medical Specialists,* 652 N.E.2d at 524 (holding that a covenant which essentially prohibited an infectious disease doctor from being involved in "any medical practice" was reasonable), *with Gleeson v. Preferred Sourcing, LLC,* 883 N.E.2d 164, 175 (Ind.Ct.App.2008)(finding noncompetition clause for sales manager unreasonable because the broad terms did not take into account the services specifically provided by the employee), *Burk v.*

*Heritage Food Serv. Equip., Inc.*, 737 N.E.2d 803, 812 (Ind.Ct.App.2000)(holding that covenant not to compete was overbroad because it prohibited the salesman employee from working in any capacity for related businesses), *MacGill*, 850 N.E.2d at 932 (holding that noncompetition clause prohibiting employment in any capacity by any other cleaning business was overbroad), *and Bridgestone/Firestone*, 5 F.Supp.2d at 683–84 (finding scope of activity covered by noncompetition clause unreasonable because it extended to "any business … similar to … any portion" of a multi-industry corporation as compared to the single industry division for which employee worked).

In the case at hand, Campbell's contract creates a prohibition against any future employment with Harlan's competitors, both by name and in general. Given Harlan's statement that it only has three true competitors in the global market, Defendants argue that the agreement is broader than necessary to protect Harlan's legitimate interests.

 Indiana operates as a "blue pencil" state, such that Indiana courts are allowed to redact unreasonable provisions in noncompetition agreements where practicable. *See Smart Corp. v. Grider*, 650 N.E.2d 80, 84 (Ind.Ct.App.1995). However, a reviewing court "may not create a reasonable restriction under the guise of interpretation, since this would subject the parties to an agreement they have not made," *Burk*, 737 N.E.2d at 811. "This blue pencil doctrine is fairly mechanical in application, so as to prevent courts from simply writing a new contract for the parties … if the covenant is clearly separated into parts and some parts are reasonable and others are not, the contract may be held divisible and the reasonable restrictions may be enforced." *Bridgestone/Firestone*, 5 F.Supp.2d at 683, *quoting Smart*

*Corp.*, 650 N.E.2d at 83–84 (internal citations omitted). Thus, to the extent a reviewing court finds a noncompetition restriction unreasonable under Indiana law, its ability to alter the agreement into a reasonable one is limited to the redaction of existing language, and the court "is prohibited from adding terms that were not originally part of the agreement." *Pathfinder*, 795 N.E.2d at 1114, *quoting Burk*, 737 N.E.2d at 811.

If the Court were to apply the "blue pencil" rule under the line of Indiana cases which proscribe such broad restrictions, the obvious provision to delete would be the final clause, which states that Campbell is prohibited from "be[ing] employed by any business which competes directly with Employer…." A redacted version of the agreement would read:

> During Employee's employment and for a period of one (1) year after he ceases to be employed by Employer, Employee shall not in the geographical area of the United States be employed by any of the following companies, their subsidiaries, divisions, or affiliates: Charles River Laboratories, Taconic, and the Jackson Laboratory, ~~or be employed by any business which competes directly with Employer in the business of managing, producing, ying and selling laboratory animals, or providing preclinical CRO services …~~

Such a modification, (if made), though, does not aid Campbell in this suit. The redaction would render the provision less expansive in scope, but it would still leave the restriction preventing Campbell from working in any capacity for a limited set of competing employers: Charles River, Taconic, and the Jackson Laboratory.

Defendants argue that even a narrowed restriction naming specific competitors violates Indiana law. Campbell points out that he did not work in the CRO division

at Harlan and that Charles River has other lines of business not offered by Harlan in North America (the region in which he worked) such as research animal diagnostics and generally engineered models and services. In *Bridgestone/Firestone*, 5 F.Supp.2d at 685, the court invalidated a noncompetition agreement restricting work "in any capacity" for competitors in diversified businesses which compete in certain named products but not others. In finding the noncompetition clause overly broad, the court in *Bridgestone/Firestone* found persuasive that there was no "meaningful competition" between the products the employee sold for his new employer when compared with those products he sold previously. *Id.* In *Pathfinder*, the Court upheld the covenant not to compete as an on-air radio personality in certain named competitive radio stations, but held that the covenant was overbroad to the extent it prohibited him from working for a competitor in *any* capacity (i.e., as an owner or security guard). 795 N.E.2d at 1114–1115. *Pathfinder* and *Bridgestone/Firestone* are helpful to Defendants because here the noncompetition agreement would ostensibly bar Campbell from working as a janitor at Charles River or on noncompetitive lines of business. These cases suggest that some Indiana Courts would find a noncompetition clause barring work for any competitor in any capacity to be overbroad and, so, unreasonable. While the record is not crystal clear on the extent of Campbell's CRO activity, unlike *Bridgestone/Firestone,* there is no evidence demonstrating that the different products Charles River offers are unrelated to the products and services Harlan does offer. The record supports Harlan's contention that it is likely Campbell's new responsibilities are connected with the products he managed at Harlan.

In sum, under Indiana law this Court concludes that the noncompetition agreement is reasonable in light of the narrow and competitive nature of the industry, the substantial overlap between services and products provided by the named direct competitors, and the legitimate interest in protecting sales information useful to the two competing companies. *See, e.g., Titus,* 758 N.E.2d at 92–94 (upholding covenant not to compete of employer in pre-press industry that prohibited employee from working in any capacity with "the businesses of the Employer," noting the "extremely competitive" nature and "highly competitive pace" of the industry); *Medical Specialists,* 652 N.E.2d at 524 (upholding as reasonable a noncompetition agreement with an infectious disease doctor-employer that restricted the doctor-employee from working "in any manner" for "any medical practice" because given the nature of infectious disease practice "it would be impossible to know whether [the doctor-employee] was, in fact, limiting himself to the practice of internal medicine.").

Finally, given Campbell's high level job role and compensation, he appeared to be a sophisticated management employee, capable of a "clear understanding of what conduct is prohibited" by this agreement. *Smart Corp.,* 650 N.E.2d at 83. *See also Titus,* 758 N.E.2d at 94 (holding broad scope of activity covered by noncompetition reasonable because the employee "knowingly executed the employment agreement" and was "handsomely compensated" as an employee of the company); *Veridiem, Inc. v. Phelan,* 17 Mass. L. Rep. 8 (Mass.Super.Ct.2003)("[Employee]'s position [with Employer] was sufficiently high that [Employer] has a justifiable interest beyond that of just ordinary competition in seeking to enforce the non-competition [agreement]....").

### c. Contract Validity

Campbell makes a final claim that the noncompetition agreement, even if reasonable, is void. When Campbell took on new supervisory responsibilities as a recruitment manager, he did not sign a new noncompetition agreement. Under Massachusetts law, "each time an employee's employment relationship with the employer changes materially such that they have entered into a new employment relationship a new restrictive covenant must be signed." *Astro–Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 16 (1st Cir. 2009). However, the "material change" rule must be predicated on evidence of conduct by the parties that clearly showed that they had abandoned and rescinded by mutual consent "the earlier employment agreement." *Id.*

Indiana has not yet reached the issue of whether a material change in an employee's job responsibilities (i.e., a promotion to a supervisory position) requires a new noncompetition agreement. It is well-settled law that "federal judges sitting in diversity jurisdiction cannot be expected to create new doctrines expanding state law." *Katz v. Pershing, LLC*, 672 F.3d 64, 73 (1st Cir.2012)(internal citations omitted). Accordingly, the court declines to follow the "material change rule" under Indiana law. In any event, defendants have produced no evidence that the earlier noncompetition agreement was rescinded or abandoned.

In sum, as the scope of the agreement is reasonable in relation to the legitimate interests of the employer and there are no public policy concerns, plaintiff can show likelihood of success on the merits of a breach of contract under the covenant not to compete.

### C. Irreparable Harm

 In addition to demonstrating likelihood of success on the merits, the likelihood of irreparable harm is a necessary threshold showing for awarding preliminary injunctive relief. *Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). "Irreparable injury in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir.2005). As a general rule, a breach of non-compete agreements tied to trade secrets concerns triggers a finding of irreparable harm. *Aspect Software, Inc. v. Barnett*, 787 F.Supp.2d 118, 130 (D.Mass.2011). Similarly, harm to goodwill is the type of harm not readily measurable or fully compensable in damages—and for that reason, more likely to be found irreparable. *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir.1989).

 Campbell argues there is no irreparable harm because he was not privy to all the types of confidential information that Harlan claims, much of the alleged confidential information is not in fact confidential, and what information he does have from his role in sales is not applicable to his current job as a marketing director, so there is no risk of disclosure. This argument is not persuasive.

It is undisputed that, at the very least, Campbell had access to large amounts of confidential customer information, including contact information, products purchased, sales preferences, and discounts received. Also undisputed is the fact that on May 29, after Campbell had begun working at Charles River, he accessed that confidential customer information on his personal computer. Campbell states that, from what he can remember, his access to

this information was merely accidental, and that he did not review, use, or disclose these materials at Charles River. However, the materials were accessed the same evening he was asked by a colleague to provide Charles River with market share information regarding their competitors. Campbell also discarded the flash drive with the confidential information, despite the fact he had previously been given a preservation order requiring him to retain all materials potentially relevant to a litigation that was very likely. Both of these facts are worrisome, and suggest that Campbell possessed and potentially used Harlan's confidential information, the disclosure and use of which could irreparably harm Harlan. *See Testa v. Wal–Mart Stores*, 144 F.3d 173, 177 (1st Cir. 1998)("[A] trier of fact may (but need not) infer from a party's obliteration of a document relevant to a litigated issue that the contents of the document were unfavorable to that party" even if the destruction was in good faith).

Additionally, although the parties dispute the similarity between Campbell's former role at Harlan and his current role at Charles River, it is likely that at least a portion of the information Campbell used in his sales manager role will overlap with the information needed as a marketing director. Charles River is one of Harlan's main competitors. At Harlan, Campbell had access to confidential information, such as sales revenue data, client contact information, sales opportunities, and pricing information. While there are distinctions in sales and marketing roles, it is easy to envision how this type of sales information could be useful to someone who develops marketing plans and advertising campaigns, and who creates products catalogs. Indeed, Harlan contends that Campbell sat in on marketing strategy meetings. Although Campbell asserts that he no longer has a specific memory regarding this confidential information, general trends in customer preferences, pricing, and sales revenue developed from access to confidential information, could usefully inform someone creating new marketing strategies and catalogs for a competitor. Even assuming the best of intentions on Campbell's part, it is difficult to conceive how all the information stored in Campbell's memory can be set aside as he applies himself in a competitor business. *See Marcam Corp. v. Orchard*, 885 F.Supp. 294, 297 (D.Mass.1995). *See also Boulanger v. Dunkin' Donuts Inc.*, 442 Mass. 635, 815 N.E.2d 572, 579 n. 12 (2004) ("[W]orking for a competitor of the defendant makes it likely that the information the plaintiff possesses will be used, yet it might be impossible to detect or prove."); *C.R. Bard, Inc. v. Intoccia*, No. 94–11568–Z, 1994 WL 601944, at *3 (D.Mass. Oct. 13, 1994) (Former employee "could not and did not leave behind his special knowledge of plaintiff's operation, and in serving his new employer he will inevitably draw upon that knowledge.").

Given Harlan's successful showing of likelihood of success on the non-compete claim, the evidence of confidential information in Campbell's possession at the start of his time with Charles River, and the potential for inevitable disclosure of information in these similar roles, plaintiff has demonstrated irreparable harm.

**D. Balance of Equities**

██ "Any potential harm caused to [Harlan] by a denial of its motion must be balanced against any reciprocal harm caused to [Campbell and Charles River] by the imposition of an injunction." *Touch-Point Solutions, Inc. v. Eastman Kodak Co.*, 345 F.Supp.2d 23, 32 (D.Mass.2004). In this instance, the harm to plaintiff outweighs that of defendants. "Non-competition agreements by their nature impose

some burden on former employees. That fact alone does not make such covenants unenforceable." *Lombard Med. Techs., Inc. v. Johannessen,* 729 F.Supp.2d 432, 442 (D.Mass.2010) (citations omitted). Campbell entered into the contract freely, and he may work for any company that does not directly compete with Harlan in certain areas. Indeed under the blue-penciling approach, (which the Court need not address), he may be able to work for direct competitors other than the three named entities. He may even work for Charles River abroad. The record indicates that he is already doing work on European markets. The harm that Harlan may suffer should Charles River make use of its confidential customer and product information outweighs this harm to Campbell.

## E. Public Interest

 "The public has an interest in the enforcement of valid contracts." *Lombard Med. Techs.,* 729 F.Supp.2d at 443. So, while any covenant not to compete temporarily restricts the free alienability of employees, "that alone is insufficient to abrogate a contract or render such covenants unenforceable." *Bio–Imaging Techs. v. Marchant,* 584 F.Supp.2d 322, 330 (D.Mass.2008) Given that the non-competition agreement here is reasonable and designed to protect Harlan's confidential information and good will, the agreements should be enforced.

In light of this order, as plaintiff seemed to acknowledge at the hearing, the Court need not rule on the second request for preliminary injunction against Charles River. Even if plaintiff were to press this request, the evidence is disputed as to whether any confidential information was actually disclosed to Charles River. Indeed Charles River protests it specifically instructed Campbell not to disclose confidential information.

## ORDER

The motion for preliminary injunction [Docket No. 7] is *ALLOWED* against Campbell until May 4, 2013. Bond is set at $77,500. Plaintiff shall submit a proposed order forthwith.