# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-CA-01882-SCT

*EDWARD DUNBAR FIELD, M.D.*

*v.*

*WAYNE T. LAMAR, M.D., P.A.*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/16/1999 |
| TRIAL JUDGE: | HON. ANTHONY THOMAS FARESE |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | E. FARISH PERCY |
| | GRADY F. TOLLISON, JR. |
| | AUBREY E. NICHOLS |
| | CAROLYN C. KESSINGER |
| ATTORNEYS FOR APPELLEE: | S. DUKE GOZA |
| | DION JEFFERY SHANLEY |
| | SHELBY KIRK MILAM |
| NATURE OF THE CASE: | CIVIL -OTHER |
| DISPOSITION: | REVERSED AND RENDERED-04/18/2002 |
| MOTION FOR REHEARING FILED: | 5/20/2002; denied 8/8/2002 |
| MANDATE ISSUED: | 8/15/2002 |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. After terminating his employment contract, Dr. Edward Dunbar Field was sued by his former employer, Dr. Wayne T. Lamar. The contract provided that Dr. Field would not practice orthopedic medicine for one year in Lafayette County after termination or breach of the contract. Judgment was eventually entered against Dr. Field for $275,000.

¶2. We hold that Dr. Lamar failed to meet his duty to apply for a writ of mandamus as required by M.R.A.P. 15, thus, the complaint stands dismissed without prejudice. The judgment for $275,000 is reversed and rendered.

## FACTS

¶3. Dr. Wayne T. Lamar is an orthopedic surgeon and owner of the Lamar Clinic, an orthopedic clinic in Oxford, Mississippi. Dr. Edward Lamar Field is an orthopedic surgeon specializing in sports medicine. On July 22, 1992, Field came to Oxford to meet with Lamar and discuss joining his practice. Prior to leaving Oxford, Field orally agreed to work with Lamar for a yearly salary of $175,000. Lamar's corporate counsel, Chad Lamar, prepared an employment contract and presented it to Field, pointing out the non-competition clause. Field lost the first copy of the contract and eventually signed a duplicate in November or December, 1992.

¶4. Originally, Field's patients were all referrals from Lamar, which included athletes from the University of Mississippi and schools in the surrounding area. Leroy Mullins, athletic trainer for the University of Mississippi, testified that he wanted a doctor to be present on the practice field every day and that he explained this to Lamar, who responded that he did not have time to be there every day. When hiring Field, Lamar told Mullins that he would get the "coverage" that he wanted on the practice field, and to "cover him up" with business. Mullins testified that it was his practice to refer the athlete to the doctor who initially examined the athlete on the field, although he acknowledged that the patient has the right to see whomever he chooses.

¶5. It is undisputed that Field spent a great deal of time on the practice field. Because of the amount of time spent with the athletes, he developed relationships with them, and the majority of them therefore sought his services rather than Lamar's. From this point forward, the doctors' relationship deteriorated. During this time, Lamar's office manager of almost twenty years, Becky James, instituted a policy whereby University of Mississippi athlete patients were allocated equally between Drs. Field and Lamar. James testified that this system failed because most of the Ole Miss patients wanted to see Field.

¶6. Two Ole Miss football players, David McCay and Mike Worley, testified that they attempted to see Dr. Field at the clinic and were given the "runaround." McCay said that he was told that he should see Lamar, and that the office staff was "making me feel like I had done something wrong." He eventually left and later saw Field in the training room. Worley testified that when he attempted to see Field, he was kept waiting for one and one-half to two hours. He said that when he asked what was taking so long, he was told "that I was not allowed to see Dr. Field due to the fact that, that was their policy." Worley insisted on seeing Field and waited another 30 minutes when he happened to see Field going down the stairs at the clinic and caught up with him. Field then took him downstairs to the rehabilitation clinic for treatment. Lamar counters that McCay was unable to see Field because he was called away from the clinic to perform emergency surgery. He does not address the testimony of Worley.

¶7. Field's working relationship with Lamar and James was strained, at best. Other employees also began to take sides behind one doctor or the other, several of whom left the Lamar Clinic with Dr. Field. Field tendered his resignation on November 15, 1993, stating that the "untenable employment situation" amounted to a failure of performance on the part of the clinic, and that he was therefore declaring the contract void pursuant to paragraph 22 of the contract. Dr. Lamar filed a lawsuit against Field the next day, seeking to, among other things, enforce the non-competition provision of the contract.

## PROCEDURAL HISTORY

¶8. Lamar filed suit against Field on November 16, 1993, in the Chancery Court of Lafayette County,

seeking a temporary restraining order ("TRO") and permanent injunction. The complaint sought to enjoin Field from practicing orthopedic medicine in Lafayette County for one year, from disclosing the contents of Lamar's patient list, and from treating or soliciting "any patient, client, or business relation of Lamar." The chancery court granted the TRO on November 17, 1993, restricting Field from practicing medicine in Lafayette County, until a hearing on the petition for permanent injunction could be held.

¶9. The TRO was lifted by an order of November 24, 1993, pending the hearing to adjudicate all issues in the case. The order allowed Field and Lamar to continue practicing orthopedic medicine at the location of their choice, but with patients to have the "sole discretion" to select which doctor to see. Field was prohibited from soliciting patients from Lamar, and Lamar was required to allow all patients free choice. The order also restricted Field from advertising his services or attempting to generate business until the hearing.

¶10. During the interim period, Field was required to maintain records "evidencing and verifying patient identification, services rendered, fees billed, fees collected, and all patient information relating to the filing of the patients' insurance." Field was also prohibited from obtaining or disclosing any part of Lamar's patient list as it existed at the time of Field's employment.

¶11. The hearing concluded on April 21, 1994. The court held that the employment contract was enforceable, including the non-compete provision, and that it expired on June 30, 1993. The court went on to hold that, until June 30, 1994, Field was enjoined from the following: 1) disclosing Lamar's client list, 2) soliciting or treating any "client or other business relation" of Lamar, unless specifically requested by the patient or client and 3) practicing or "seeking to establish an orthopedic practice" in Lafayette County. No damages or costs were assessed. The issue of compensation earned during the "restricted period" was left for resolution at a later date. The court entered its final decree on May 23, 1994, affirming and incorporating its prior holding.

¶12. On January 18, 1995, the court conducted a hearing to determine whether Field owed compensation to Lamar for services rendered by Field during the period between Field's resignation on November 15, 1993, and April 21, 1994, when the court granted the injunction. As the court ordered, both parties submitted proposed findings of fact and conclusions of law by February 22, 1995.

¶13. The court eventually issued its Supplemental and Final Opinion on October 22, 1999, holding that "it is reasonably certain that Dr. Lamar suffered damages incurred by Dr. Field." It went on to award damages of $275,000 to Lamar, but it denied attorney fees. The court further held that the case did not stand dismissed pursuant to M.R.A.P. 15 (a) and (c) "in the interest of justice, judicial efficiency and economy."

¶14. Field timely filed a notice of appeal. He raises the following issues:

> **I. WHETHER THE CASE STANDS DISMISSED PURSUANT TO RULE 15 OF THE MISSISSIPPI RULES OF APPELLATE PROCEDURE.**

> **II. WHETHER THE TRIAL COURT ERRED IN FINDING THAT THE NON-COMPETE PROVISION WAS VALID AND ENFORCEABLE.**

> **III. WHETHER LAMAR IS ENTITLED TO DAMAGES GIVEN THAT FIELD ACTED IN ACCORDANCE WITH THE COURT'S NOVEMBER 24, 1993, AGREED ORDER.**

**IV. WHETHER LAMAR PROPERLY PLED DAMAGES.**

**V. WHETHER LAMAR INTRODUCED SUFFICIENT EVIDENCE OF DAMAGES.**

**VI. WHETHER THE TRIAL COURT ERRED IN ISSUING AN INJUNCTION PROHIBITING DR. FIELD FROM PRACTICING IN LAFAYETTE COUNTY FOR A PERIOD OF MORE THAN TWO MONTHS.**

## DISCUSSION

### I. WHETHER THE CASE STANDS DISMISSED PURSUANT TO RULE 15 OF THE MISSISSIPPI RULES OF APPELLATE PROCEDURE.

¶15. Field argues that Lamar's complaint should be dismissed pursuant to M.R.A.P. 15(c) due to Lamar's failure to seek a writ of mandamus as required by M.R.A.P. 15(a). We agree.

¶16. Rule 15 of the Mississippi Rules of Appellate Procedure provides in part:

> If a trial judge in a civil case fails to render a decision on a motion or request for relief which would be dispositive of all the claims or the rights and liabilities of all the parties, within six (6) months after taking such a motion or request under advisement, any party in the case may apply to the Supreme Court for a writ of mandamus to compel the trial judge to render a decision on the matter taken under advisement or deferred. Application for a writ of mandamus must, except in the case of excusable neglect and in which manifest injustice will result from the failure to allow the later filing, be made within 45 days after the expiration of six (6) months from the date the motion or request was taken under advisement by the trial judge.

M.R.A.P. 15 (a). Rule 15 also states:

> If a party who filed the original complaint fails to apply for a writ of mandamus within the time prescribed, the complaint shall stand dismissed without prejudice, except upon a showing that the failure to timely apply resulted from excusable neglect and that manifest injustice will result from the dismissal.

M.R.A.P. 15 (c).

¶17. Having found Field liable, as of May 23, 1994, the only unresolved issue before the chancellor was the determination of damages owed to Lamar. The court conducted a hearing to resolve whether Field owed compensation to Lamar for services rendered by Field during the period between Field's resignation on November 15, 1993, and April 21, 1994, when the court granted the injunction. As the court ordered, both parties submitted proposed findings of fact and conclusions of law by February 22, 1995.

¶18. Therefore, as of February 22, 1995, the court had taken the case under advisement. The chancery court failed to render its decision within six months of taking the matter under advisement, or by August 22, 1995, as required by M.R.A.P. 15(a). The burden was then on Lamar to petition this Court within 45 days thereafter, or October 6, 1995, for a writ of mandamus to compel the trial judge to render a decision. This he failed to do.

¶19. Field subsequently sought to have Lamar's complaint dismissed on December 12, 1997. The chancery

court refused, holding that it did "not have jurisdiction of a Rule 15 M.R.A.P. motion. In the interest of justice, judicial efficiency and economy, the parties would be better served to abide by this opinion, or an agreement of settlement." The plain language of the rule indicates that it clearly applies to "a judge in a civil case," and the chancellor therefore had jurisdiction to hear the motion. Furthermore, where an erroneous legal standard was applied to the facts, this Court will apply a de novo standard of review of the chancellor's findings and will not hesitate to reverse. *Par Indus., Inc. v. Target Container Co.*, 708 So. 2d 44, 47 (Miss. 1998) (citing *Mississippi State Dep't of Human Servs. v. Barnett*, 633 So. 2d 430, 434 (Miss. 1993)).

¶20. As support for his position, the chancellor relied on this Court's opinion in *Town of Lucedale v. George County Nursing Home*, *Inc.*, 482 So. 2d 223, 224-25 (Miss. 1986). That opinion dealt with the predecessor of Rule 15, which was Supreme Court Rule No. 47. In *Town of Lucedale*, the chancellor heard the case, took it under advisement, and did not render an opinion until more than seven years later. *Id*. at 224. Rule 47 provided that a complaint would stand dismissed without prejudice if the party filing the original complaint fails to file for a writ of mandamus within 45 days, where the court has taken the matter under advisement and not rendered an opinion within six months. *Id.*

¶21. The town argued that the case stood dismissed, and we agreed, based on a literal reading of the rule. The rule was then held to be suspended in the interest of justice because enforcing it would require the nursing home to begin proceedings de novo, which would be time barred, after already having been awarded a judgment. This Court refused to allow the town to use the rule "as a shield against an adverse decision." *Id*. at 225. We stated:

> The case under consideration provides an example where the employment of the rule would work counter to the purpose behind the rule . . . If this Court temporarily suspends Rule 47 for this case, then the matter will return to the Aldermen with the findings of the chancellor intact. Certainly judicial efficiency and economy would be better served by the latter option. The former would serve, primarily, to allow the appellant a "second bite at the apple." Rule 47 was intended to be used as a sword, to prod trial courts toward a timely determination of cases.

*Id.*

¶22. In *Town of Lucedale,* the chancellor rendered its opinion on May 27, 1983, more than seven years after the case was taken under advisement. The next day, the town sought to have the opinion vacated. It is therefore distinguishable from the instant case, as the court in *Town of Lucedale* had already rendered its opinion before the defendant sought to have the rule enforced. Here, Field asked the court to enforce the rule and dismiss the complaint against him on December 12, 1997, almost two years before the chancellor rendered his opinion. Therefore, at the time of seeking to enforce Rule 15, no judgment was entered against Field.

¶23. In the present case, the chancellor refused to dismiss the complaint, citing several circumstances that led to the long delay. First, Lamar's original counsel left the area without notifying Lamar. Lamar contends that he was unable to contact his attorney, and eventually hired new counsel on September 19, 1996. Also, the chancellor was diagnosed with Parkinson's Disease with Shy-Drager Syndrome, which required hospitalization in 1996, 1997, 1998, and 1999. He was granted leaves of absence in 1997 and 1998. Eventually, this Court appointed a special chancellor to help with the volume of cases. Lamar contends that these circumstances constitute excusable neglect in failing to apply for a writ of mandamus, and points out

that Field never applied for one, either. The illness of the chancellor and his absence in 1996, 1997, 1998, and 1999, while unfortunate, do not relieve Lamar of his burden under the rule to seek a writ of mandamus by the prescribed time period. The burden was on Lamar to seek a writ of mandamus, regardless of whether, as a practical matter, the chancellor would have been able to promptly comply with the writ.

¶24. Furthermore, the failure of either of Lamar's attorneys to file for the writ does not constitute excusable neglect. In *In re Estate of Ware*, 573 So. 2d 773 (Miss. 1990), the appellant could not reach her attorney from July 26 through October 9, calling him several times a day and leaving messages at his home and with his sister. When she finally reached him, he informed her that the chancellor had ruled against her, and that her time to file an appeal had expired. *Id.* at 774. She hired another attorney the next day and filed a motion for an out-of-time appeal, citing excusable neglect. This Court held that the inability of the appellant to reach her attorney and the attorney's failure to timely file a notice of appeal did not amount to excusable neglect, and we denied her request.

¶25. *Ware* is analogous to the instant case, involving the application of Mississippi Supreme Court Rule 4(g), the predecessor to M.R.A.P. 4(g). Rule 4(g) requires a showing of excusable neglect before an out-of-time appeal may be permitted. Likewise, Rule 15(c) requires a showing of excusable neglect as a threshold requirement to avoiding dismissal under the rule. Similarly, M.R.C.P. 60(b)(2) provides for relief from judgment upon a showing of "accident or mistake." These terms have been interpreted as requiring a showing by the party seeking relief from the judgment that he was justified in failing to avoid mistake or inadvertence. *Stringfellow v. Stringfellow*, 451 So. 2d 219, 221 (Miss. 1984). We have explained that "gross negligence, ignorance of the rules, or ignorance of the law is not enough." *Id.*

¶26. Lamar failed to demonstrate the excusable neglect necessary to prevent dismissal of his complaint pursuant to Rules 15(a) and 15(c) of the Mississippi Rules of Appellate Procedure. Therefore, the complaint stands dismissed without prejudice, and the judgment against Field is reversed and rendered. Because the first assignment of error is dispositive, we do not reach the remaining five.

¶27. For these reasons, we reverse the circuit court's judgment, and we render judgment dismissing the complaint and this action without prejudice as provided in M.R.A.P. 15.

¶28. **REVERSED AND RENDERED.**

**PITTMAN, C.J., WALLER, COBB, EASLEY, CARLSON AND GRAVES, JJ., CONCUR. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J. EASLEY, J., JOINS IN PART.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶29. Being very familiar with the majority opinion that is now being authored by Presiding Justice Smith, I agree with it. However, I would go farther and overrule on the issue of non-compete contracts as applied to medical professionals just as we require that lawyers cannot have non-compete clauses in their employment contracts with associates.

¶30. This Court has recognized the public policy concerns implicated by non-competition agreements between attorneys. The Comment to Rule 5.6 of the Rules of Professional Conduct states as follows: "An agreement restricting the right of partners or associates to practice after leaving a firm not only limits their professional autonomy, but also limits the freedom of clients to choose a lawyer." Rule 5.6 specifically

forbids employment agreements between attorneys that contain non-competition provisions. This rule was adopted in 1987. Miss. Rules of Prof'l Conduct R. 5.6 (amended 1998). This same rule should apply to physicians and their partners overseeing them because this affects their professional autonomy and the freedom of patients to choose and have access to their physician of choice.

¶31. The American Medical Association Ethical Opinion 9.02 "discourages any agreement which restricts the right of a physician to practice medicine for a specified period of time or in a specified area upon termination of an employment, partnership or corporate agreement."

¶32. Lamar points out that the AMA does not have rule-making authority in Mississippi, and that no such authority has heretofore declared such non-competition agreements to be against public policy. However, most practicing doctors are members of the AMA, and there is little doubt that, if the AMA had rule-making authority, it would clearly adopt a rule for doctors similar to our RPC 5.6 for attorneys.

¶33. Non-competition agreements between medical doctors are unenforceable, as they are in conflict with the public policy of patient choice. Lamar argues that the provision is enforceable because it was reasonable as to the duration of the restriction and the geographic scope. He cites several cases in which non-competition provisions were enforced which were of longer duration and greater geographic scope than that at bar. *See Texas Road Boring Co. v. Parker*, 194 So.2d 885, 888 (Miss. 1967) (upholding two-year restriction within 100 miles of any city in which employee worked); *Redd Pest Control Co. v. Heatherly*, 248 Miss. 34,157 So.2d 133 (1963) (enforcing two-year restriction within 50-mile radius); *Bagwell v. H.B. Wellborn & Co.*, 247 Miss. 564, 156 So.2d 739 (1963) (upholding two-year restriction within 75-mile radius of city); *Frierson v. Sheppard Building Supply Co.*, 247 Miss. 157,154 So.2d 151, 156 (1963) (enforcing two-year non-competition provision within 50 miles of city).

¶34. None of these cases involve non-competition provisions between doctors or physicians, so the public policy concerns of patient choice were not present. The only Mississippi case cited by Lamar involving doctors is *Wilson v. Gamble*, 180 Miss. 499, 177 So. 363 (1937). In that case, this Court upheld a non-competition agreement between general practitioners in Greenville that prevented employee doctors from practicing within five miles of Greenville for five years after resigning. In doing so, the Court specifically noted that there were numerous general practitioners in Greenville to serve the public. A more modern view today would conclude that the patients' choice should come first. Therefore, we should overrule *Wilson v. Gamble* as it conflicts with the modern day view. Since this decision, we adopted the modern view on not allowing no-compete contracts for lawyers as stated above in 1987. *See* Miss. Rules of Prof'l Conduct R. 5.6 (amended 1998).

¶35. Lamar also cites cases from other jurisdictions in which such provisions were enforced between doctors. *Med. Specialists, Inc. v. Sleweon*, 652 N.E.2d 517 (Ind. Ct. App. 1995); *Ballesteros v. Johnson*, 812 S.W.2d 217 (Mo. Ct. App. 1991). Both of these cases are distinguishable.

¶36. In *Ballesteros,* the doctor was not prohibited from treating patients who independently sought his services. Field, on the other hand, was enjoined from treating all patients in Lafayette County, even if they independently sought his services. In *Med. Specialists, Inc.,* the appellate court enforced the non-competition agreement, but only after finding that there were adequate infectious disease doctors to serve the area, and the enforcement of the provision would therefore not harm the public.

¶37. On the other hand, other jurisdictions have routinely refused to enforce non-competition agreements

between doctors which limit patient choice and are therefore against public policy. In ***Iredell Digestive Disease Clinic, P.A. v. Petrozza***, 373 S.E.2d 449 (N.C. Ct. App. 1988), *aff'd per curiam* , 377 S.E.2d 750 (N.C. 1989), the court refused to enforce a non-competition agreement where the doctor to be enjoined from practice was only one of two gastroenterologists in the area.

> Given the particular facts of this case, we believe the public's interest in adequate health care must predominate over the parties' freedom to contract . . . The doctor-patient relationship is a personal one and we are extremely hesitant to deny the patient-consumer any choice whatsoever.

373 S.E.2d at 455. *See also **Statesville Med. Group, P.A. v. Dickey***, 418 S.E.2d 256 (N.C. Ct. App. 1992) (holding provision unenforceable as against public policy where the written employment contract was signed by both parties, based on reasonable consideration, and reasonable as to time and territory restrictions).

¶38. Other jurisdictions have struck down non-compete agreements based on the same reasoning. *See **Valley Med. Specialists v. Farber,*** 982 P.2d 1277, 1283 (Ariz. 1999) (holding that provision would not be enforced due to that fact that "the doctor-patient relationship is special and entitled to unique protection") ; ***Hoddenson v. Conroe Ear, Nose, & Throat Assocs., P.A.***, 751 S.W. 2d 289 (Tex. Ct. App. 1988) (refusing to enforce non-competition agreement that prevented an ear, nose, and throat doctor from practicing within a county for five years, finding that to do so would be harmful to the public, as the doctor was one of only a few ear, nose, and throat specialists in the county).

¶39. In the instant case, the evidence is clear that a majority of the Ole Miss athletes preferred to see Dr. Field. Were that not the case, this litigation would have probably never been initiated. Forcing patients who preferred to see Dr. Field to travel at least twenty miles to a neighboring county undoubtedly interferes with their right to choose their physician.

¶40. The chancellor placed great emphasis on the fact that Dr. Lamar had been practicing orthopedic medicine in Oxford since 1973. However, just because he was there first does not grant him the exclusive right to the university athletic business and future patients. Non-compete agreements between physicians can be enforceable within certain contexts. Such as, a physician must abide by the duty of confidentiality toward his patient and must therefore protect the patients on his patient list from a former associate's unwelcome solicitations. These concerns must be balanced with a patient's right to use the physician of his or her choice. When Dr. Field was contacted by one of Dr. Lamar's patients, Dr. Field should have had the right of access to Dr. Lamar's medical file on the patient with the appropriate release and consent. A non-compete agreement cannot deny access to a patient's choice of physician. Non-competition agreements must be reasonable on the restrictions and economic justifications. *See **Thames v. Davis & Goulet Ins., Inc.***, 420 So.2d 1041, 1043 (Miss. 1982). Any exclusive right to impinge on a physician's autonomy and the patient's right of choice would undoubtedly undermine the public policy interests.

¶41. For these reasons, I dissent in reversing the chancery court judgment, as I would render judgment for Dr. Field finally dismissing Dr. Lamar's complaint and this action with prejudice because the non-competition agreement is unenforceable.

**DIAZ, J., JOINS THIS OPINION. EASLEY, J., JOINS IN PART.**