**CREDENTIALS PLUS, LLC,**
Plaintiff/Counter–
Defendant,

v.

**Jill S. CALDERONE,**
Defendant/Counter–
Plaintiff,

and

**National Credentials Corporation,**
Defendant.

**No. 3:01–CV–0602 CAN.**

United States District Court,
N.D. Indiana,
South Bend Division.

Nov. 7, 2002.

892

Paul J. Peralta, D. Lucetta Pope, Baker and Daniels, South Bend, IN, for Plaintiff.

Timothy W. Woods, J. Thomas Vetne, Jones Obenchain LLP, South Bend, IN, for Defendants.

## MEMORANDUM AND ORDER

NUECHTERLEIN, United States Magistrate Judge.

Plaintiff Credentials Plus, LLC brought this action on August 22, 2001 alleging violations of both Indiana and federal law against Defendants Jill S. Calderone and National Credentials Corporation stemming from Calderone's March 2001 departure from Credentials Plus. Calderone counterclaimed with two counts against Plaintiff. On June 18, 2002, both Plaintiff [Doc. No. 35] and Defendants [Doc. No. 37] moved for summary judgment on various aspects of this case. The parties' motions were soon followed by Defendants' Motion to Strike affidavit statements from Plaintiffs' supporting documents [Doc. No. 45]. For the following reasons, Plaintiff's Partial Motion for Summary Judgment [Doc. No. 35] is **GRANTED**. Defendants & Counter–Plaintiff's Motion for Summary Judgment [Doc. No. 37] is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion to Strike [Doc. No. 45] is

**DENIED IN PART** and **DENIED AS MOOT IN PART**.

## I. FACTUAL HISTORY

While many factual allegations in the parties' filings conflict, the basic factual framework of this case is as follows. As of 1997, Defendant Jill Calderone and Anthony Nyers were members of Midwest Medical Services (MMS), an Indiana corporation with its principle place of business in Indiana. MMS served as a credentialing service for physician practice groups and health care providers. MMS's primary services included the assembly of credential-related data for physicians in client practice groups, delivering applications to health care organizations and government reimbursement programs, and providing client practice groups with reports of their physicians' data in relation to health providers and reimbursement programs. MMS's business prospects, unfortunately, were not bright. By July 1998, MMS only had one client, the South Bend Clinic (SBC), forcing Calderone and Nyers to look for outside assistance and investment. The two soon associated with Joseph Crowley to form Credentials Plus, LLC.

### A. Formation and Operation of Credentials–Plus, LLC

On July 1, 1999 Nyers, Crowley, and Calderone entered into a "Letter Agreement" outlining Credentials–Plus's makeup and operation. Credentials–Plus was composed of MMS and Healthcare Economics Group, LLC (HEG), a South Carolina limited liability company. MMS was to provide the daily management and professional services for Credentials–Plus, and Healthcare Resources Group, a wholly-owned subsidiary of HEG, was to provide the new LLC with support services. (Letter Agreement at 1). Calderone, Nyers, and HEG each owned one-third of Credentials–Plus. *Id.* at 3. Credentials–Plus's stated purpose was to "provide medical credentials management services to providers, including complete, turnkey credentials management and on-demand credentials services." *Id.* The agreement also provided that Calderone would serve as president and chief operating officer of Credentials–Plus, as well as provided for Calderone's salary and vacation pay. *Id.* at 2. The company registered with the Indiana Secretary of State on October 4, 1999.

Until her departure, Calderone served as Credentials–Plus's sole officer and operating employee. Calderone's service, however, was marred by internal conflict.[1] Beginning in 1999, Calderone began to complain about sexually illicit comments and behavior directed at her by Nyers. She first complained to Crowley about the alleged harassment in September 1999. In November 2000, Calderone confronted Nyers about an alleged rumor that the two were having an affair. On March 15, 2001, Calderone told Crowley that she would have to leave Credentials–Plus due to the alleged incidents. The events culminated on March 28, 2001, when Calderone telephoned Crowley and told him that she was

---

1. While Calderone's pleadings and supporting memoranda repeatedly refer to alleged acts of sexual harassment between her and Nyers, Calderone brought no formal claims against Nyers, Crowley, or Credentials–Plus regarding these accusations. Opposing parties must bring any counterclaim which, at the time they are served, they have against any opposing party, if the counter claim arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties over whom the court cannot acquire jurisdiction. Fed.R.Civ.P. 13(a). Because Calderone never brought any claims against Plaintiff for sexual harassment, this Court may only view her allegations as background facts in relation to her departure from Credentials–Plus.

quitting due to the alleged harassment. That same day, Calderone's attorney sent Nyers and Crowley a letter offering to sell them Calderone's shares in Credentials–Plus.

Despite the poor working environment, Credentials–Plus thrived under Calderone's stewardship. In November 2000, Tony Walz created a website for Credentials–Plus allowing the company to advertise with potential clients and share information with existing customers. By March 2001, Credentials–Plus's clients included SBC, Lake Park Surgicare, Allied Physicians of Michiana, Grossnickle Eye Center, Chandana Surgery Center, Mercy Health Systems, and Coast–to–Coast Medical, LLC. Additionally, Credentials–Plus solicited business with other health care providers throughout the country. Calderone's duties included maintaining a database of physician credentials data, pricing information, client contacts, and health organizations' credentialing requirements. The database was protected using access passwords.

B. *Formation of National Credentials Corporation and Calderone's Departure from Credentials–Plus*

As previously stated, Calderone had expressed concern about her working environment to Crowley until her departure on March 28, 2001. The parties disagree as to whether Calderone's performance at Credentials–Plus waned prior to her departure. Amidst these conflicting stories, however, several documents establish a timeline pertinent to Plaintiff's allegations.

On March 17, 2001, prior to her departure, Calderone registered a domain name for National Credentials Corporation with the internet site Register.com, setting up an email for herself and listing the site's administrative contact as National Credentials Corporation. (Verisign, "Whois" internet search report). After her departure, while still owning shares in Credentials–Plus, Calderone filed articles of incorporation with the Georgia Secretary of State, incorporating National Credentials on April 6, 2001.[2] Calderone also sent several letters and emails to health care providers soliciting business for her new company. *See e.g.* (April 7, 2001 email from Calderone to Neal Russell at Critical Health Systems). Calderone sold her shares in Credentials–Plus to her father, Antonio Taveres, on June 7, 2001.

C. *Credentials–Plus's Status After Calderone's Departure*

Because Calderone served as Credentials–Plus's sole operating officer, the company was virtually unable to function after Calderone's departure.[3] After its contract ran out, SBC, Credentials–Plus's longest running customer accounting for over half the company's business, took its credentialing services in-house. Credentials–Plus's contracts were also terminated with Allied Physicians, Lake Park Surgery Center, Mercy Health Services, and Grossnickle Eye Center.

II. PROCEDURAL HISTORY

Plaintiff brought this action on August 22, 2001 alleging five causes of action un-

---

2. Calderone's signature on the articles of incorporation is dated April 10, 2001. However, the file stamp from the Georgia Secretary of State's office states that the document was filed on April 6.

3. The parties conflict as to whether Calderone refused to train a replacement after she left or whether Plaintiffs Crowley and Nyers were

unwilling to hire any additional help prior to Calderone leaving Credentials–Plus. The parties also conflict as to the status of the company's database after Calderone's departure. Plaintiffs allege that Calderone left the computer system unworkable while Calderone contends that the system was working as of March 28, 2001.

der both Indiana and federal law against Defendants Jill S. Calderone and National Credentials: (1) violation of the Indiana Trade Secrets Act, Ind.Code § 24–2–3–2 *et seq.;* (2) intentional interference by Defendants with Plaintiff's business relations, (3) conversion of property under Ind.Code § 35–43–4–3 *et seq.;* (4) breach of fiduciary duty; and (5) violation of the federal Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030 *et seq.* Calderone counterclaimed for unpaid vacation and general wages as well as reimbursement for the purchase of office furniture. The parties consented to proceed before this Court on October 2, 2001.

On June 18, 2002, the parties filed simultaneous motions for summary judgment. Plaintiff moved for summary judgment on count four of its complaint, and Defendants moved for summary judgment on all aspects of the case. On August 6, 2002, Defendants filed a Motion to Strike affidavit statements from Plaintiffs' pleadings.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Lawson v. CSX Transp., Inc.,* 245 F.3d 916, 922 (7th Cir.2001). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the nonmoving party as well as draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *King v. Preferred Technical Group,* 166 F.3d 887, 890 (7th Cir.1999). To overcome a motion for summary judgment, the nonmoving party cannot rest on the mere allegations or denials contained in its pleadings. Rather,

the nonmoving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Robin v. Espo Engineering Corp.,* 200 F.3d 1081, 1088 (7th Cir.2000); *See also* N.D. Ind. L.R. 56.1(b) ("In determining a motion for summary judgment, this Court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted ... as supported by the depositions, discovery responses, affidavits, and other admissible evidence on file."). Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *Bank of Ariz. v. Cities Services Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## IV. DEFENDANTS' MOTION TO STRIKE

On August 6, 2002 Defendants moved to strike portions of Anthony Nyers's June 18, 2002 and July 18, 2002 affidavits used in support of Plaintiff's motion for summary judgment and memorandum in opposition to Defendants' motion for summary judgment. Defendants argued that the affidavits were "inadmissible speculative statements, half-truths, or false statements." (Defendants' Memo. in Support of Mot. to Strike at 1).

Affidavits made in support of and opposition to summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P.

56(e). In granting summary judgment, this Court may consider any evidence that would be admissible at trial. *Stinnett v. Iron Works Gym/Executive Health SPA, Inc.*, 301 F.3d 610, 613 (7th Cir.2002). The evidence need not be admissible in form, but it must be admissible in content. *Id.* On a motion for summary judgment, a court must not consider those parts of an affidavit that are insufficient under Rule 56(e). *Adusumilli v. City of Chicago*, 164 F.3d 353, 359 (7th Cir.1998).

The majority of Defendants' objections contend that Nyers was not involved in the daily functions of Credentials–Plus, and that he therefore lacks sufficient personal knowledge to testify as to Calderone's behavior. Although Defendants fail to cite adequate guiding authority, their accusations are based on well-settled legal principles. *See e.g. Id.* at 359 (striking an affidavit for lack of foundation and concern for matters not within an affiant's personal knowledge); *Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir.1985) (stating that legal argument in an affidavit may be disregarded as conclusory).[4] If admissible facts and inadmissible statements are mingled in the same affidavit, this Court may rely on the admissible facts and disregard the rest. 10B Wright, Miller & Kane, *Federal Practice and Procedure: Civil*, § 2738 (1998) (citing *Cobin v. Rice*, 823 F.Supp. 1419, 1436 n. 5 (N.D.Ind.1993)).

This order will individually address the instances where it is necessary to rely on portions of Nyers's affidavit subject to Defendants' motion. All other objections which are not specifically addressed in this order, and hence not relied upon, are **DENIED AS MOOT.**

## V. Calderone's Breach Of Fiduciary Duty

Both parties moved for summary judgment regarding Plaintiff's allegation that Calderone breached her fiduciary duty to Credentials–Plus. This Court may rule on this issue pursuant to 28 U.S.C. § 1367. Plaintiff's claim requires this Court to address Calderone's fiduciary breach in light of both contract and common law principles.

### A. Credentials–Plus's Covenant Not to Compete

■ The July 1, 1999 letter agreement between Calderone, Nyers, and Crowley, stated that "[n]o shareholder may participate in any way in any venture that competes with [Credentials–Plus] either directly or indirectly without formal written approval of the other [Credentials–Plus] shareholders." (Letter Agreement at 1). Indiana courts view non-compete covenants as restraints on trade, and, as such, give them a narrow construction. *Duneland Emergency Physician's Medical Group, P.C. v. Brunk*, 723 N.E.2d 963, 965–966 (Ind.Ct.App.2000). Such covenants, however, are enforceable if the restrictions are reasonable as to the parties and the general public. *Id.* In determining the reasonableness of non-compete restrictions, this Court must look to: (a) whether the restrictions are wider than necessary for the protection of the covenantee; (b) the effect of the promise upon

---

**4.** Plaintiffs also appear to have given Defendants' motion to strike short shrift, addressing the motion in terms of Fed.R.Civ.P. 12(f). Rule 12(f) addresses motions to strike with regard to pleadings. Affidavits and other evidentiary matters submitted in support of, or in response to, a motion for summary judgment are not "pleadings" within the meaning of Rule 12(f). *Hrubec v. National Railroad Pass. Corp.*, 829 F.Supp. 1502, 1506 (N.D.Ill. 1993) (finding that courts are unwilling to construe "pleading" so broadly as to include motions and their accompanying memoranda); *Meredith v. Allsteel, Inc.*, 814 F.Supp. 657, 660 (N.D.Ill.1992) (holding that rule 12(f) permits motions to strike matters at the pleading stage, not at the summary judgment stage).

the covenantor; and (c) the effect upon the public. *Id.* (citing *Medical Specialists, Inc. v. Sleweon,* 652 N.E.2d 517, 522 (Ind. Ct.App.1995)). Specifically, this Court must consider the scope of the employer's legitimate business interests and the geographic and temporal limits required by the covenant. *Id.* (citing *Norlund v. Faust,* 675 N.E.2d 1142, 1154 (Ind.Ct.App. 1997)). The ultimate determination of whether a non-competition covenant is reasonable is a question of law. *Raymundo v. Hammond Clinic Ass'n,* 449 N.E.2d 276, 280 (Ind.1983); *Burk v. Heritage Food Service Equipment, Inc.,* 737 N.E.2d 803, 811 (Ind.Ct.App.2000).

■ The July 1, 1999 non-compete covenant was a reasonable restraint on Credentials–Plus's shareholder activities both temporally and geographically. Regarding temporal limits, the covenant only restricted competition while Calderone owned shares in Credentials–Plus. It made no restriction against her activities after selling her shares.[5] Regarding geographical limitations, the clause's omnibus "in any way" language is reasonable in light of the national nature of the company. Credentials–Plus, while operating out of South Bend, solicited clients nationally through its internet website. *See e.g.* (Answer at ¶ 12) (admitting ¶ 12 of Plaintiff's Complaint: "To attract new customers, *both in and outside Indiana,* and to communicate with and provide services to existing customers, *both in and outside Indiana,* Credentials–Plus has maintained a website...since November 2000.")(emphasis added). Further, the clause had no noticeable effect on the public. Seeing this, Calderone was free to compete with Credentials–Plus after selling her shares on

June 7, 2001. Calderone, however, failed to wait that long.

■ On March 17, 2001, prior to her departure, Calderone registered an internet domain name for National Credentials Corporation with the internet site Register.com, set up an email for herself, and listed the site's administrative contact as National Credentials Corporation. (Verisign, "Whois" internet search report). After leaving Credentials–Plus, but while still owning shares in the company, Calderone filed articles of incorporation for National Credentials with the Georgia Secretary of State on April 6, 2001. She also sent several letters and emails to health care providers soliciting business for her new company. *See e.g.* (April 7, 2001 email from Calderone to Neal Russell at Critical Health Systems) ("As you have probably guessed, I have resigned as President of Credentials–Plus. I am now doing some work for a company in Georgia. I would love to talk to you. It would be greatly appreciated if you do not mention my new job to any folks at C–Plus. They are not real happy with me right now!"); (May 18, 2001 letter from Calderone to Dawn McLane, Executive Director of Allied Surgery Center) (discussing credentialing contracts between National Credentials and Allied Surgery Center) ("I appreciate the opportunity to continue our relationship."); (June 1, 2001 letter from Calderone to Dawn McLane) (discussing an outsourcing agreement between National Credentials and Allied Surgery Center); (May 24, 2001 letter from Calderone to Paul Meyer of SBC)(soliciting credentialing business from SBC).

The aforementioned documents create an uncontested paper-trail of Calderone's

---

**5.** The only restriction on alienation of shares in the letter agreement was a right of first refusal granted to remaining LLC members: "If any shareholder wishes to divest any interest in [Credentials–Plus], the remaining shareholders shall have a right of first refusal, in equal shares, to purchase the shares being sold at a price equal to any written offer." (Letter agreement at 4).

efforts to compete with Credentials–Plus for physician credentialing services while still holding shares in Credentials–Plus both before and after her departure. Such activity violates the non-compete clause between Calderone, Nyers, and Crowley.

### B. Common Law Principles of Fiduciary Duty

In addition to the contractual breach, Calderone's activities demonstrate a breach of her fiduciary duties under common law principles as well. Limited liability companies (LLCs) such as Credentials–Plus were not available in Indiana until the enactment of Indiana's Business Flexibility Act in 1993. Ind.Code 23–18–1–1 et seq. Because of the relative infancy of this statute, there is little Indiana case law regarding LLCs and relatively no case law regarding fiduciary duties under LLC operating agreements.[6] In her response to Plaintiff's motion, Calderone acknowledges that she "owed a fiduciary duty to the other members of [Credentials–Plus] which obliged her to deal fairly, honestly and openly with them." (Defendant's Memo. in Opp. to Plaintiff's Mot. at 2).

Because limited liability companies are relatively new business entities, courts are forced to grapple with financial and liability issues in terms of LLCs' similarities to partnerships and corporations. *See e.g. Jordan v. Com.*, 36 Va.App. 270, 549 S.E.2d 621, 622 (2001); *Lieberman v. Wyoming.com, LLC*, 11 P.3d 353, 357 (Wyo. 2000); *Ruggio v. Vining*, 755 So.2d 792, 795 n. 2 (Fla.Dist.Ct.App.2000)(noting the similarities between LLCs, partnerships, and corporations; Herbst, Charles, *New Business Entity Limits Liability, Taxability*, 37 Res Gestae 14, 14 (1993) (examining the financial structure of LLCs) ("While an LLC is a distinct type of entity, it is a hybrid between a corporation and a partnership."); *See also* Copperthwaite Jr., William H., *Limited Liability Companies: The Choice for the Future*, 103 Comm. L.J. 222 (1998) (discussing the history of LLCs). In light of LLCs' hybrid nature, examination of Indiana's standards for fiduciary breaches under partnership and corporate law is helpful in assessing Calderone's conduct.

### 1. Partnerships

The evaluation of fiduciary duties within Indiana partnerships is governed by Indiana's Uniform Partnership Act. Ind. Code 23–4–1–1 et seq.[7] Indiana courts

---

**6.** The recent proliferation of LLC statutes has forced courts nationwide to address traditional business issues in terms of state law. *See* Hastings, David M., Annotation, *Construction and Application of Limited Liability Company Acts*, 79 ALR5th 689 (2000); Callison, J. William and Maureen A. Sullivan, *Limited Liability Companies: A State–by–State Guide to Law and Practice*, § 8.7 (2002) ("there is no case law concerning fiduciary duties in the LLC context").

**7.** The similarity between Indiana's partnership and LLC laws regarding duties and obligations among members or partners warrants consideration. *Compare* Ind.Code 23–4–1–21(1) ("Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any

transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.") to Ind.Code 23–18–4–2(b) ("Unless otherwise provided in a written operating agreement, each member and manager must account to the limited liability company and hold as trustee for it any profit or benefit derived by the manager or member without the consent of a majority of the disinterested managers or members or other persons participating in the management of the business or affairs of the limited liability company from: (1) a transaction connected with the conduct or winding up of the limited liability company; or (2) any use by the manager or member of the limited liability company's property, including confidential or proprietary information of the limited liability company or other matters entrusted to the manager or member because of

have followed traditional partnership principles, maintaining that "[m]any forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties." *Boushehry v. Ishak,* 550 N.E.2d 784, 788 (Ind.Ct.App.1990) (citing *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (1928) (Cardozo, J.) (referring to the "duty of the finest loyalty" among partners)). Upon dissolution of a partnership, partners' fiduciary duties remain intact until all business is completed. *Boushehry,* 550 N.E.2d at 788. Departing partners have a "duty not to take any action with respect to the unfinished business of the partnership which leads purely to personal gain." *Id.* at 789. Partners have a further duty not to seize hold of any existing opportunities available to the partnership at the time of their association. *Id.*[8]

### 2. *Corporations*

Under Indiana law, a corporation is considered "close" if it has relatively few shareholders and does not have publically traded shares. *G & N Aircraft, Inc. v. Boehm,* 743 N.E.2d 227, 236 n. 2 (Ind. 2001). Because Credentials–Plus's membership consisted of only Calderone, Crowley, and Nyers, and there is no indication that the company's shares were publically traded, comparison to a close corporation is appropriate.

Shareholders of close corporations owe fiduciary duties substantially different from the duties owed by their counterparts in publicly traded corporations. *Melrose v. Capitol City Motor Lodge, Inc.,* 705 N.E.2d 985, 990–91 (Ind.1998) ("Indiana courts have characterized closely-held corporations as 'incorporated partnerships'

and as such have imposed a fiduciary duty upon shareholding 'partners' to deal fairly not only with the corporation but with fellow shareholders as well.") Shareholders may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to other shareholders and the corporation. *Barth v. Barth,* 659 N.E.2d 559, 561 n. 6 (Ind.1995). A shareholder's fiduciary duty requires that he "not appropriate to his own use a business opportunity that in equity and fairness belongs to the corporation." *McLinden v. Coco,* 765 N.E.2d 606, 615 (Ind.Ct.App.2002). The standard imposed by a fiduciary duty is the same whether it arises from the capacity of a director, officer, or shareholder in a close corporation. *G & N Aircraft,* 743 N.E.2d at 240.

■ For the foregoing reasons, this Court finds that Indiana LLCs, being similar to Indiana partnerships and corporations impose a common law fiduciary duty on their officers and members in the absence of contrary provisions in LLC operating agreements. The Credentials–Plus letter agreement had no provision limiting liability, and Calderone attempts to argue that she is not subject to common law fiduciary principles by stating that she was not a member of Credentials–Plus, but rather owned her shares in the LLC through Chandler–Dadyn Group, LLC, of which she was the sole member. (Defendant's Memo. in Opp. to Plaintiff's Mot. at 7). Calderone's argument is unpersuasive, especially given the fact that, even if she was able to shield herself from membership by operating behind the veil of a LLC, Calderone admits that she "owed a fiduciary duty to the other members of

---

the manager's or member's status as manager or member").

**8.** *See also* 59A Am.Jur.2d Partnership § 458 *et al.* (discussing the seizure of partnership opportunities in light of common law rights,

duties, and obligations among general partners) ("A partner who secures a valuable contract for himself, contrary to his duty to obtain the contract for his partnership, violates his fiduciary duty to the firm.").

[Credentials–Plus] which obliged her to deal fairly, honestly and openly with them." (Defendant's Memo. in Opp. to Plaintiff's Mot. at 2). Additionally, Calderone served as Credentials–Plus's sole officer and operating employee, subjecting her to a fiduciary duty to refrain from seizing business opportunities presented to Credentials–Plus.

█ Calderone's correspondence to physicians groups including language such as "I am now doing some work for a company in Georgia ... I would love to talk to you;" "It would be greatly appreciated if you do not mention my new job to any folks at C–Plus ...They are not real happy with me right now;" and "I appreciate the opportunity to continue our relationship" is clear evidence of self-dealing and a breach of her duty of loyalty under Indiana law. Calderone's client solicitation and competitive practices both while an officer and shareholder of Credentials–Plus demonstrates a fiduciary breach.

Therefore, Plaintiff's Partial Motion for Summary Judgment regarding Defendant Calderone's breach of fiduciary duty is **GRANTED**. Accordingly, Defendants' motion with regard to the same issue is **DENIED**.

## VI. Trade Secrets

Defendants moved for summary judgment regarding count one of Plaintiff's complaint, which alleged that Calderone and National Credentials violated the Indiana Uniform Trade Secrets Act. Ind. Code 24–2–3–1 *et seq.* Plaintiff's complaint lists the following items as trade secrets: (1) Credentials–Plus's database of credential-related information; (2) the software adapted to manipulate this information; (3) Credentials–Plus's pricing and costing information; (4) information on client needs and contacts; (5) Credentials–Plus's marketing plan; and (6) methods for organizing and presenting data to physi-

cian groups and other clients. (Complaint at ¶ 31). Plaintiff alleges that Defendants misappropriated its trade secrets through improper means and are currently benefitting from those secrets. *Id.* at ¶ 34. This Court may rule on this issue pursuant to 28 U.S.C. § 1367.

The six items listed in Plaintiff's complaint can be narrowed into three general categories. The first, prong two of Plaintiff's trade secret allegation, consists of the software packages used by Credentials–Plus in its operations. The second, prongs one, three, four, and five of Plaintiff's allegation, allege that Defendants used data collected concerning Plaintiff's client contacts, marketing strategy, and pricing information in an effort to obtain clients for National Credentials. The third, prong six of Plaintiff's allegation, concerns Plaintiff's methods for organizing and presenting data to physician groups and other clients.

### A. Indiana's Uniform Trade Secrets Act

Indiana courts have held that a protectable trade secret has four characteristics: (1) it is information, (2) which derives independent economic value, (3) that is not generally known, or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (4) is the subject of efforts, reasonable under the circumstances, to maintain its secrecy. Ind.Code 24–2–3–2; *Hydraulic Exchange and Repair, Inc. v. KM Specialty Pumps, Inc.,* 690 N.E.2d 782, 785 –786 (Ind.Ct.App.1998). Unlike other states, Indiana does not require a trade secret to provide its holder with a competitive advantage. *Weston v. Buckley,* 677 N.E.2d 1089, 1092 n. 1 (Ind.Ct. App.1997). The determination of whether a particular device or process is a trade secret is a fact-sensitive test. *Amoco Production Co. v. Laird,* 622 N.E.2d 912, 916 (Ind.1993); *Weston,* 677 N.E.2d at 1092.

B. *Computer Software*

■ In light of the fact-sensitive nature surrounding trade secrets, this Court is reluctant to rule on this issue as a matter of law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 ("Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party."). No genuine fact issues exist, however, with regard to Calderone's use of Credentials–Plus's computer software. While working at Credentials–Plus, Calderone used two commercially available software programs: "Quickbooks," an accounting program, and "Cactus," a program used to generate credentialing reports. (Nyers March 5, 2002 Dep. at 99) (stating that Credentials–Plus never developed its own software program). After forming National Credentials, Calderone developed a new software system named "Plan Manager," which she used to complete and track credentialing applications. Defendants maintain that the creation of Plan Manager occurred wholly independent of any information Calderone obtained while working at Credentials–Plus, and Plaintiffs have done little to contradict Defendants' assertion. *See e.g.* (Nyers March 5, 2002 Dep. at 117–118) (admitting that he has little to no knowledge regarding National Credentials's software program).

Plaintiff's response to Defendants' motion hardly addresses its initial allegation that the software used by Credentials–Plus constituted a trade secret or that Calderone misappropriated this software for the benefit of National Credentials. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548 (holding that a nonmoving party cannot rest on the mere allegations or denials contained in its pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial). It is also difficult to imagine how two commercially available software programs could constitute information that was not generally known, or readily ascertainable by proper means by other persons. Because the evidence Plaintiff presents could not lead a rational trier of fact to find that Calderone's use of these programs violated the Indiana Uniform Trade Secrets Act, Defendants motion for summary judgment with regard to the use of Plaintiff's software programs is **GRANTED.**

C. *Credentials–Plus's Customer and Pricing Information*

■ Plaintiff's claims with respect to Defendants' use of its client contact and pricing information are more problematic. Whether customer information constitutes a trade secret or confidential information depends upon the facts of each individual case. *Harvest Life Ins. Co. v. Getche,* 701 N.E.2d 871, 876 (Ind.Ct.App.1998) (citing *Woodward Insurance, Inc. v. White,* 437 N.E.2d 59, 67(Ind.1982)). In *Harvest Life,* the court held that an insurance company's policyholder list was not a trade secret because the information, which included names of customers, policy coverage, premium amounts, and expiration dates, was obtainable from individual policyholders, actual insurance policies, and other materials. *Id.* (citing *Prudential Insurance Company Of America v. Baker,* 499 N.E.2d 1152 (Ind.Ct.App.1986)). Defendants follow this reasoning, contending that Calderone solicited potential clients by obtaining their names and addresses by calling chambers of commerce, examining the yellow-pages, and obtaining information from the Medical Group Management Association's membership roster. (Def. Memo. in Supp. of Def. Mot. at 13).

Were Plaintiff's allegations limited to client contact lists, Indiana law would require that this Court grant summary judgment favoring Defendants. Plaintiff,

however, presents evidence that its client information was intertwined with secure pricing data. *Compare* (February 8, 2001 email from Calderone to Nyers and Crowley)(discussing prices charged by Credentials–Plus for initial filing and recredentialing);(Calderone Dep. at 67–69)(stating that Credentials–Plus's pricing information was confidential) with (Calderone Dep. at 172)(stating that Grossnickle Eye Center dictated its service price to Credentials–Plus); *See also* (Calderone Dep. at 67, 88) (describing the contents of and security measures concerning Credentials–Plus's database).

Where customer compilations include more than the customer names, such as pricing information, profits, sales, and special suppliers that are specific to each customer, a party's effort of compiling its customer and pricing information is entitled to protection even if the customer names may generally be known. *Hydraulic*, 690 N.E.2d at 786 (citing *Amoco*, 622 N.E.2d at 920). The juxtaposition between the evidence submitted in this matter precludes entry of summary judgment. Defendants' motion for summary judgment with regard to the misappropriation of Plaintiff's client information and pricing structure is therefore **DENIED**.

D. *Methods for Organizing and Presenting Data*

■ Prong six of Plaintiff's trade secret allegation argues that Plaintiff's methods for organizing and presenting data to physician groups and other clients were trade secrets, and that Defendants misappropriated them for use at National Credentials. It is unclear what constitutes Plaintiff's organization and presentation methods. To the extent that organization procedures relate to Credentials–Plus's informational database, summary judgment with regard to that issue was dealt with in the preceding section. In addition to the company's database, however, both Credentials–Plus

and National Credentials maintained similar operating procedures.

While at Credentials–Plus, Calderone developed policies, procedures, and form proposals which Defendants admit are similar to operating policies and procedures that Calderone developed for National Credentials. (Def. Memo. in Supp. of Def. Mot. at 9). Defendants maintain, however, that both companies' procedures were similar to national standards, and that any similarity between them stems from their mutual resemblance to national criteria. *Id.;* (Calderone Dep. at 79, 81). Defendants further submit evidence that Calderone provided copies of Credentials–Plus's standards material to clients upon request, indicating that the information was not confidential. (Calderone Dep. at 78–79). Plaintiff offers no evidence to contradict Defendants' claims. Because this Court must assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted, N.D. Ind. L.R. 56.1(b), Defendant's motion with regard to methods for organizing and presenting data to physician groups and other clients is **GRANTED**. It is noted, however, that this Court's ruling on this matter is limited to the misappropriation of trade secrets as they apply to Credentials–Plus and National Credentials's operating procedures.

VII. **INTERFERENCE WITH BUSINESS RELATIONSHIPS**

■ Plaintiff alleges that Calderone and National Credentials intentionally interfered with Credentials–Plus's business relations by (1) soliciting Credentials–Plus clients using misappropriated, confidential, and/or proprietary information; (2) interfering with Credentials–Plus's ability to serve its clients; (3) soliciting potential Credentials–Plus clients; (4) re-routing email from the Credentials–Plus website;

(5) misappropriating Credentials–Plus's trade secrets; (6) breaching Calderone's fiduciary duty owed to Credentials–Plus; and (7) exercising unauthorized control over Credentials–Plus's property. (Complaint at ¶ 42–43). This Court may rule on this issue pursuant to 28 U.S.C. § 1367.

In Indiana, tortuous interference with a business relationship consists of five elements: (1) the existence of a valid relationship; (2) defendant's knowledge of the relationship; (3) defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's interference. *Levee v. Beeching*, 729 N.E.2d 215, 222 (Ind.Ct.App.2000); *Harvest Life*, 701 N.E.2d at 876.[9] Numerous factual disputes preclude summary judgment on this issue. *Compare e.g.* (Albright Aff. at ¶ 5–7); (Raybold Aff. at ¶ 6) (alleging that Calderone stopped providing status reports to SBC and collecting SBC's correspondence prior to her departure from Credentials–Plus) with (Calderone Aff. at ¶ 4c) (contesting Albright and Raybold's knowledge of SBC operations); *See also* (Section V, *supra*, and citations there-in)(holding that Defendant Calderone breached her fiduciary duty to Plaintiff); (Section VI, *supra*, and citations there-in)(holding that material questions of fact exist with regard to Defendants' alleged misappropriation of trade secrets). Therefore, Defendants' motion with regard to Defendants alleged intentional interference with Plaintiff's business relations is **DENIED.**

### VIII. STATUTORY CONVERSION

■■■ Plaintiff alleges that Defendants exercised unauthorized control over Credentials–Plus's property including, but not limited to Credentials–Plus's: (1) printer; (2) office supplies; (3) contractual right to attend a professional conference with the National Association of Medical Staff Services (NAMSS); (4) trade secrets; (5) credit cards; and (6) website email. (Complaint at ¶ 52). This Court may rule on this issue pursuant to 28 U.S.C. § 1367.

In Indiana, a person who knowingly or intentionally exerts unauthorized control over the property of another commits criminal conversion. Ind.Code 35–43–4–3.[10] This order addresses Defendants' al-

---

**9.** Plaintiff's claim also includes allegations that Defendants interfered with Credentials–Plus's contractual relationships. The elements of an action for tortious interference with a contract are: (1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach. *Levee*, 729 N.E.2d at 221. Actions for both tortious interference with business and contractual relationships include the same core elements. *Id.* at 221 n. 4. An action for intentional interference with a business relationship arises where there is no contract underlying the relationship involved in the litigation. *Id.* at 220.

**10.** Indiana law defines "property" as "anything of value" including: "(1) a gain or advantage or anything that might reasonably be regarded as such by the beneficiary; (2) real property, personal property, money, labor, and services; (3) intangibles; (4) commercial instruments; (5) written instruments concerning labor, services, or property; (6) written instruments otherwise of value to the owner, such as a public record, deed, will, credit card, or letter of credit; (7) a signature to a written instrument; (8) extension of credit; (9) trade secrets; (10) contract rights, choses-in-action, and other interests in or claims to wealth; (11) electricity, gas, oil, and water; (12) captured or domestic animals, birds, and fish; (13) food and drink; and (14) human remains." Ind.Code 35–41–1–23(a). Property is that "of another person" if the other person has a possessory or proprietary interest in it, even if an accused person also has an interest in that property. Ind.Code 35–41–1–23(b).

leged misappropriation of trade secrets in section VI. For reasons previously stated, summary judgment with regard to that matter is **DENIED.**

Although not listed in count three of Plaintiff's complaint, Defendants move for summary judgment as to the conversion of a website template used by Credentials–Plus in the creation of National Credentials's website. (Def. Memo. in Supp. of Def. Mot. at 16–17). Plaintiff's opposing memorandum does not address this issue. Therefore, summary judgment with respect to the website template is **GRANTED**. This Court's ruling on this matter is limited only to the conversion of the website template and does not pertain to any use of either company's websites in the solicitation of business or Plaintiff's CFAA claim.

A. *Plaintiff's Factual Support in Opposition to Defendants' Motion is Sufficient to Defeat Summary Judgment*

■■■■ In opposing Defendants' motion with regard to Calderone's alleged conversion of office supplies and attendance at a professional conference, Plaintiff relies on paragraphs 9–11 of Nyers supplemental affidavit. Because these paragraphs are subject to Defendants' motion to strike, it is necessary to address the basis for Nyers's supplemental statements.

This Court has "great discretion" in determining whether an affidavit is sufficient under Rule 56(e). *Maldonado v. U.S. Bank,* 186 F.3d 759, 769 (7th Cir.1999). Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Fed.R.Civ.P. 56(e). Defendants contend that Nyers never affirmatively demonstrated that he is competent to testify as to the alleged conversion of an office printer, (Nyers Supp. Aff. at ¶ 9), various office supplies including a copy of *Marquis Who's Who, Id.* at ¶ 10, and an unreturned registration fee for a March 2001 NAMSS conference. *Id.* at ¶ 11.

Every witness is presumed competent to testify, unless it can be shown that the witness does not have personal knowledge of the matters about which he is to testify, that he does not have the capacity to recall, or that he does not understand the duty to testify truthfully. *United States v. Gutman,* 725 F.2d 417, 424 (7th Cir. 1984).[11] While the Seventh Circuit has not directly addressed this issue, Rule 56 does not require affiants to affirmatively state that they are competent to testify. Moreover, other sources find that personal knowledge as related to competence may be inferred from the contents of an affidavit as a whole rather than from an explicit assertion that the affiant has personal knowledge for each statement in an affidavit. *See e.g. Barthelemy v. Air Lines Pilots Ass'n,* 897 F.2d 999, 1018 (9th Cir. 1990)("Rule 56(e)'s requirements of personal knowledge and competence to testify have been met may be inferred from the affidavits themselves."); 10B Wright, Miller & Kane, *Federal Practice and Procedure: Civil,* § 2738 (1998)("[T]he content of the document must show that the affiant is competent to testify."); 11 Moore's Federal Practice § 56.14[1][c] (Matthew Bend-

---

**11.** Fed.R.Evid. 601 states that every person is competent to be a witness except as otherwise provided in the Federal Rules. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law. Fed.R.Evid. 601. Indiana's competency rule mirrors the federal standard and provides that every person is competent to be a witness except as otherwise provided by the Indiana rules or by act of the Indiana General Assembly. Ind. R. Evid. 601.

er 3d ed. 2002)("Personal knowledge may also flow logically from the context of the affidavit. For example ... corporate officers are presumed to have personal knowledge of the acts of their corporation.").

Statements in Nyers's supplemental affidavit, to which Defendants do not object, establish that Nyers had personal knowledge of Credentials–Plus's operations and procedures. *See e.g.* (Nyers Supp. Aff. at ¶ 1)("I have personal knowledge of the following facts"); *Id.* at ¶ 2 ("I ... have owned interest in Credentials–Plus since its inception"); *See also* (Nyers Dep. at 53–54) (stating that Nyers frequently spoke with Crowley and Calderone regarding Credentials–Plus). In addition to Nyers' own statements, Plaintiff has submitted evidence to buttress Nyers' claims. *See e.g.* (Feb. 8, 2001 invoice for an office printer); (April 2001 Citibank USA statement including charges for office supplies); (February 2001 American Express Statement including charges for the NAMSS conference).

Regarding paragraphs 9 and 10 of Nyers's supplemental affidavit, Defendants further contend that the affidavits should be stricken because they conflict with Nyers's earlier deposition. A party may not create an issue of fact by submitting an affidavit whose conclusions contradict a prior deposition or other sworn testimony. *Kalis v. Colgate–Palmolive Co.*, 231 F.3d 1049, 1055 (7th Cir.2000). *See also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999)("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."). An affidavit contradicting earlier deposition testimony need not be disregarded if it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is a plausible explanation for the discrepancy. *Maldonado,* 186 F.3d at 769; *See also Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1315 (7th Cir.1989) ("An inconsistent affidavit may preclude summary judgment ... if the affiant was confused at the deposition and the affidavit explains those aspects of the deposition testimony or if the affiant lacked access to material facts and the affidavit sets forth the newlydiscovered evidence.").

Plaintiff is not attempting to contradict statements made in Nyers's deposition with its supplemental affidavit. To the contrary, Nyers was unable to answer many of Defendants' questions regarding office products because he could not remember the specifics surrounding payment for office supplies "off the top of [his] head". (Nyers Dep. at 59 ll. 10). Nyers's supplemental affidavit is simply an attempt to produce evidence such as transaction receipts to rebut Defendants' claim that no factual dispute exists as to the conversion of Credentials–Plus's office products and a conference registration. It is not an attempt to backtrack on damaging statements made during a deposition. Therefore, Defendants' motion to strike paragraphs 9–11 from Nyers's supplemental affidavit is **DENIED**. This evidence being admissible, a genuine question of fact exists as to Calderone's alleged conversion of office products and the NAMSS registration. Therefore, Defendants' motion for summary judgment with regard to Plaintiff's conversion claim is **DENIED**.

IX. COMPUTER FRAUD AND ABUSE ACT

■ Genuine fact questions also preclude summary judgment on Plaintiff's CFAA claim. An individual violates the Computer Fraud and Abuse Act if he or

she: (1) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer where the conduct involves an interstate or foreign communication; (2) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1–year period; (3) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; (4) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or (5) intentionally accesses a protected computer without authorization with the intent to defraud traffics in any password or similar information through which a computer may be accessed without authorization. 18 U.S.C. § 1030 et seq.[12] A protected computer is one which is used in interstate or foreign commerce or communication. 18 U.S.C. § 1030(e)(2)(B). This Court may rule on this issue pursuant to 28 U.S.C. § 1331.

Plaintiff alleges that Defendants, acting in concert with Tony Walz who created Credentials–Plus's website, intentionally accessed Credentials–Plus's computer and obtained information on clients and potential clients residing outside Indiana by rerouting client email originally sent to Credentials–Plus. (Complaint at ¶ 61). Plaintiff's computer was used to send and receive email to customers throughout the

country and therefore qualifies as a protected computer under the CFAA.

After Calderone resigned from Credentials–Plus, Plaintiff discovered that the Credentials–Plus website was altered to redirect email sent by potential clients to an email address entitled "credentialsplus@yahoo.com." Defendants argue that Calderone has no knowledge of the email address and cite to Nyers's deposition in which he states that he is uncertain as to who established the account. See (Calderone Dep. at 183–84) (denying that she created the Yahoo account); (Nyers Dep. at 77–78) (stating that he is unaware as to who exactly established the account). Plaintiff counters Defendants' assertions, however, with evidence linking Calderone to the surreptitious email. See (Yahoo! Inc. Affidavit) (stating that the Yahoo account was created on January 1, 2001 and listing jcalderone@credentialsplus.com as an alternate email address for the account).

Even if Defendants are correct, and Calderone has no knowledge of the Yahoo account, Plaintiff has produced sufficient evidence to create and inference that Defendants violated the CFAA and preclude summary judgment. See Anderson, 477 U.S. at 255, 106 S.Ct. 2505 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). Defendants' motion for summary judgment as it pertains to Plaintiff's CFAA claims is therefore **DENIED.**

### x. DEFENDANTS' COUNTERCLAIMS

Pursuant to Fed.R.Civ.P. 13, Defendant Calderone brought two counterclaims against Credentials–Plus.[13] Calderone

---

**12.** The Act has numerous other provisions dealing with the fraudulent taking of information from government computers which are not relevant in this case.

**13.** The counterclaims are brought in Calderone's name only rather than on behalf of Calderone and National Credentials. Calderone originally brought a counterclaim against

moved for summary judgment on her counterclaims on June 18, 2002. This Court may rule on these issues pursuant to 28 U.S.C. § 1367.

## A. *Count I: Back Wages*

■ The Credentials–Plus letter agreement provided Calderone with a base salary of $3,428.00 per month to be increased by four percent of the company's baseline revenue per year as well as three weeks paid vacation per year. (Letter Agreement at 2). The contract also granted MMS a "preferred payment" of $2400.00 per month for thirty-six months from Credentials–Plus's revenues and $1,200.00 per month for twenty-four months. *Id.* at 1.[14] Calderone was allowed three weeks paid vacation per year. *Id.* at 2. Upon her resignation, Calderone demanded three weeks vacation pay in the amount of $2,388.37 and three unpaid monthly distribution checks in the amount of $1,200.00 each for April, May, and June.[15] Credentials–Plus refused Calderone's demands.

Under the Indiana Wage Payment Statute, employees, upon separation from employment, must be paid the amount due them at their next and usual payday. Ind. Code 22–2–5–1(b). Indiana courts have held that vacation pay constitutes deferred compensation in lieu of wages and is thus subject to the provisions of the statute. *Indiana Heart Associates, P.C. v. Bahamonde,* 714 N.E.2d 309, 311 (Ind.Ct.App.1999)(citing *Jeurissen v. Ami-*

*sub, Inc.,* 554 N.E.2d 12, 13 (Ind.Ct.App. 1990)). An employee is entitled to her accrued vacation pay to the time of termination "provided no agreement or published policy exist[s] to the contrary...." *Indiana Heart Associates,* 714 N.E.2d at 311–312. (citing *Die & Mold, Inc. v. Western,* 448 N.E.2d 44, 48 (Ind.Ct.App.1983)). Employers have the burden of showing a violation of employment policies when denying an employee accrued vacation pay. *Id.* at 312–313.

In *Indiana Heart Associates,* an employee sued her former employer for accrued vacation pay after she was terminated for gross misconduct. The court denied the employee summary judgment because her employment handbook stated that vacation pay would be denied for such a termination. *Indiana Heart Associates,* 714 N.E.2d at 313.

The Credentials–Plus letter agreement has no language similar to the handbook in *Indiana Heart Associates,* and Plaintiff has provided absolutely no law in its effort to rebut Calderone's claim. Rather, Plaintiff has cited numerous contested and uncontested facts concerning Calderone's conduct and fiduciary breaches prior to her departure, possibly alluding to its affirmative defenses of unclean hands, waiver, and estoppel. *See* (Defendant's Memo. in Opp. to Plaintiff's Mot. at 16–18); *See also Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548 (holding that the nonmoving party cannot rest on the mere allegations or

Plaintiffs for malicious prosecution. This Court dismissed that claim without prejudice on October 22, 2001.

**14.** It is surprising that Calderone attempts to avoid her fiduciary responsibilities by arguing that her membership in Credentials–Plus was not in her individual capacity, but through other business enterprises, while seeking back wages by expressly stating that she and MMS are equivalent entities. *See* (Def. Memo. in Supp. of Def. Mot. at 23) (inserting a paren-

thetical reference to Calderone in relation to MMS). *See also,* Section V, *supra,* (discussing Calderone's fiduciary duties).

**15.** Neither parties' pleadings or written submissions state in what year Credentials–Plus failed to make its distributions. Because Calderone left Credentials–Plus in 2001, this Court will assume that she is demanding distribution checks for April, May, and June of 2001.

denials contained in its pleadings to avoid a motion for summary judgment.).

This Court can find no Indiana caselaw regarding the parties' situation in relation to the equitable doctrines of waiver and estoppel, and Plaintiff's reliance on the doctrine of unclean hands is misguided. The doctrine of unclean hands is not favored by Indiana courts and must be applied with "reluctance and scrutiny." *Wagner v. Estate of Fox*, 717 N.E.2d 195, 202 (Ind.Ct.App.1999). For the doctrine to apply, the party who is charged with having unclean hands must be guilty of intentional misconduct. *Id.; Tomahawk Village Apts. v. Farren*, 571 N.E.2d 1286, 1294 (Ind.Ct.App.1991). In addition, the misconduct charged must be directly related to the case at issue. *See Keller v. Indiana Dept. of State Revenue*, 530 N.E.2d 787, 789 (Ind.Tax1988)(addressing Indiana's interpretation of the unclean hands doctrine).

Although Calderone breached her fiduciary duties to Plaintiff, Plaintiff has no basis for its allegation that, simply because Calderone committed wrongdoings, she is not entitled to vacation pay, some of which was accrued prior to her fiduciary breaches. In light of Plaintiff's lackluster opposition to Calderone's counterclaim and the fact that Credentials–Plus's letter agreement has no pertinent provision, this Court will not expand upon matters of common law attributed to Indiana courts. Therefore, Calderone's motion for summary judgment with respect to her accrued vacation pay of $2,388.37 is **GRANT-**ED. Accordingly, the liquidated damages and attorney fees mandated by Ind.Code 22–2–5–2 are also awarded.[16]

 Calderone also demanded three unpaid monthly distribution checks in the amount of $1,200.00 each for April, May, and June. The reasoning awarding her accrued vacation pay is inapplicable to this amount. Calderone left Credentials–Plus on March 28, 2001, prior to the months for which she is demanding distribution checks. Furthermore, the letter agreement states that monthly distribution checks are to be paid to MMS, consisting of both Nyers and Calderone, not Calderone individually. For these reasons, it would be inequitable to award Calderone the entire amount she requests. Therefore, Calderone's motion for summary judgment with respect to the April, May, and June distribution checks is **DENIED**.

B. *Count II: Unpaid Credit Card Charges*

Calderone was issued a MasterCard while employed by Credentials–Plus for use in making purchases on behalf of Plaintiff. Calderone alleges that she used the credit card to purchase furniture and various office supplies, and that Plaintiff has yet to reimburse her for the cost. Plaintiff counters with evidence that it paid portions of the credit card debt attributable to Credentials–Plus. *See* (Nyers Supp. Aff. at ¶ 13) ("Credentials–Plus has paid for the office furniture Calderone charged on her MasterCard account.");

---

**16.** Ind.Code 22–2–5–2 provides: "Every such person, firm, corporation, limited liability company, or association who shall fail to make payment of wages to any such employee as provided in section I of this chapter shall, as liquidated damages for such failure, pay to such employee for each day that the amount due to him remains unpaid ten percent (10%) of the amount due to him in addition thereto, not exceeding double the amount of wages due, and said damages may be recovered in any court having jurisdiction of a suit to recover the amount due to such employee, and in any suit so brought to recover said wages or the liquidated damages for nonpayment thereof, or both, the court shall tax and assess as costs in said case a reasonable fee for the plaintiff's attorney or attorneys." Ind.Code 22–2–5–2.

(August 27, 2001 correspondence between Nyers and Citibank USA and accompanying transaction register). Because this evidence presents a factual dispute as to Calderone's counterclaim, Calderone's motion for summary judgment with respect to her unpaid MasterCard balance is **DENIED**.

Defendants' motion to strike attacks paragraph thirteen of Nyers's supplemental affidavit, arguing that "[t]his statement does not address the issue; it may be half-true. Standing alone it is meaningless and thus irrelevant and not admissible." (Defendants' Memo. in Support of Mot. to Strike at ¶ 8). For the reasons stated in section VIII.A, Nyers has sufficient basis for his statement. Defendants' motion to strike paragraph thirteen of Nyers's supplemental affidavit is therefore **DENIED**.

XI. CONCLUSION

For the foregoing reasons, Plaintiff's Partial Motion for Summary Judgment [Doc. No. 35] is **GRANTED**. Defendants & Counter–Plaintiff's Motion for Summary Judgment [Doc. No. 37] is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion to Strike [Doc. No. 45] is **DENIED IN PART** and **DENIED AS MOOT IN PART**. Specifically, this Court rules as follows:

- Plaintiff's Partial Motion for Summary Judgment regarding Defendant Calderone's breach of fiduciary duty is **GRANTED**. Accordingly, Defendants' motion with regard to the same issue is **DENIED**.
- Defendants' Motion for Summary Judgment regarding Defendants' alleged misappropriation of Plaintiff's trade secrets is **GRANTED IN PART** and **DENIED IN PART**.
 - Defendants' motion with respect the software used by Credentials–Plus is **GRANTED**.

- Defendants' motion with regard to methods for organizing and presenting data to physician groups and other clients is **GRANTED**.
 - Defendants' motion with respect to all other trade secret allegations is **DENIED**.
- Defendants' Motion for Summary Judgment regarding Defendants' alleged intentional interference with Plaintiff's business relations is **DENIED**.
- Defendants' Motion for Summary Judgment regarding Defendants' alleged statutory conversion of Credentials–Plus's property is **GRANTED IN PART** and **DENIED IN PART**.
 - Defendants' motion with regard to conversion of Credentials–Plus's website template is **GRANTED**.
 - Defendants' motion as it pertains to all other alleged instances of statutory conversion is **DENIED**.
- Defendants' Motion for Summary Judgment regarding the Computer Fraud Abuse Act is **DENIED**.
- Defendants' Motion for Summary Judgment regarding Defendants' counterclaim for Calderone's past wages and vacation pay is **GRANTED IN PART AND DENIED IN PART**.
 - Plaintiff's motion with respect to accrued vacation pay is **GRANTED**.
 - Plaintiff's motion with respect to all other wage claims is **DENIED**.
- Defendants' Motion for Summary Judgment regarding Defendants' counterclaim for reimbursement of Calderone's credit card debt is **DENIED**.
- Defendants' Motion to Strike is **DENIED IN PART and DENIED AS MOOT IN PART**.
 - Defendants' motion with regard to paragraphs 9–10 and 13 of Anthony

Nyers's July 22, 2002 Supplemental Affidavit is **DENIED**.

- All remaining portions of Defendants' Motion to Strike are **DENIED AS MOOT**.

**SO ORDERED.**